In re the MARRIAGE OF Frances BA-DALAMENTI, Petitioner-Respondent,

and

Frank Badalamenti, Respondent-Appellant.

No. 38342.

Missouri Court of Appeals, St. Louis District, Division Three.

March 21, 1978.

Motion for Rehearing and/or Transfer Denied May 9, 1978.

Dowd & Oates, Edward L. Dowd, Francis M. Oates, St. Louis, for respondent-appellant.

Gross & Goodman, Michael A. Gross, Mark E. Goodman, John Gerst, Peter Ferrara, St. Louis, for petitioner-respondent.

WEIER, Judge.

Petitioner Frances Badalamenti (hereinafter referred to as Frances) filed a petition for dissolution of her marriage to Frank Badalamenti (hereinafter referred to as Frank). After hearing the evidence, the trial court dissolved the marriage and awarded custody of the eighteen year old adopted son to Frank. The court also decreed that no child support be paid, ordered the husband to pay the wife $150 a month maintenance and made orders dividing the parties' property so that the wife was awarded a dwelling house (which she valued at about $26,000), the 1972 automobile, all household goods and furnishings (except for a few items which the court found were the property of the son or the separate property of the husband), and $5,000 in cash

"which sum respondent is ordered to pay to petitioner from one or more of the accounts or certificates of deposit standing in his name or under his control," and the husband was awarded "all other savings accounts, stocks, certificates of deposit, bonds and debentures standing in his name or under his control," which if one were to accept certain evidence totaled about $35,-000. The trial court also ordered the husband to pay the wife's attorney fee. On appeal the husband contests the $5,000 cash award to the wife, the granting of "all or virtually all of the marital property," so he says, to the wife and the order requiring him to pay her $150 per month maintenance. Disposition of the first two issues depends primarily on whether the husband proved that money in various savings accounts was his or his sisters' separate property because it came from the sale of property he and his sisters had inherited prior to his marriage. We affirm the trial court judgment in all respects.

The parties were married in Italy in 1949. Frances had been born and raised in St. Louis and Frank had been a citizen of Italy. Frances found a sponsor for Frank and he came to St. Louis in 1950, becoming a naturalized U. S. citizen two years later. Prior to the marriage Frank's parents died and he and his two sisters jointly inherited some property from their parents. Frank also inherited some property in his name only. These pieces of property were sold at different times, with the sale of the last and largest piece occurring in 1970. The details of the sales and allegedly corresponding investments by Frank is discussed later.

From 1950 until 1955 the couple lived in an apartment with Frances' mother. The mother paid for the rent and most other expenses during this period. She worked doing hand sewing as did her daughter Frances. Frank worked as a tailor earning $45 a week gross for about a year, then $69 a week for a time, and then $90 a week gross. For a number of years he worked at two jobs.

In 1955 the trio moved into a house on De Tonty Street in St. Louis. The couple bought the house in both of their names for a total price of about $14,000. About half of this amount was paid as a down payment. Frances said the money for the down payment came from money saved by Frank out of his wages. Frank testified that some of the down payment was from his own savings and that about $3,000 was a gift from his uncle. Frank paid off the loan on the house by 1960 partly from his paycheck and partly from money from his uncle. Neither Frances nor her mother contributed to the purchase price of the house. Because of disagreements between Frank and his mother-in-law, she moved out of the house on De Tonty and back to her old apartment for about two years and then she moved back to live with the couple again. Frank's nephew, Salvatore Badalamenti, lived at the house on De Tonty for three or five years and Frank's niece and her husband lived there for about six months without paying any rent. While the husband, wife and wife's mother lived on De Tonty, Frances and her mother cooked meals and kept the house. After Frances' mother retired, she looked after the couple's son while Frank and Frances were working. With the money she received from social security, Frances' mother paid for several improvements on the house including a water heater and storm windows. Frances and her mother purchased most of the furniture used by the family during the marriage. Frances paid for her own expenses and for some of the household expenses and each of the three purchased food. The son was born and adopted in 1957.

In October, 1960, the couple signed a contract to purchase, in both of their names, a house on Newton Drive in Ferguson, Missouri, for a total price of $19,450. Sometime in 1960 or 1961 the family (husband, wife, son and wife's mother) moved into this new house. Both the initial down payment and the monthly mortgage payments for this house were paid by Frank. The source of the funds for these payments is not very clear. The down payment apparently was $7,000. Two thousand dollars of this amount was a loan from the Italian

Society. This loan was paid off from some of the money received when the house on De Tonty was condemned by the city for a highway in 1966. An additional $4,000 from the De Tonty property went into the house on Newton, for a total of $6,000. Some money from Frank's Italian inheritance also went into the house on Newton but he did not know the exact amount. Presumably some of the money for the house on Newton came from Frank's earnings and from rent received on the De Tonty house between the time the family left that house in 1961 until it was sold to the city in 1966. The last payment on the house on Newton was made in 1969 or 1970. While the family lived in this house, Frank paid the utility bills. He also purchased a new furnace. Both Frank and Frances said they paid for some of the food.

When the De Tonty house was condemned for a highway in 1966, the city paid about $18,000 for it. It is not clear what happened to this money. As mentioned earlier Frank testified that about $6,000 of that amount went into the house on Newton.[1] According to Frances $5,000 of the $18,000 for the De Tonty house went into an account in the name of the husband as trustee for the son. She also testified, and Frank later acknowledged, that about $16,900 of the money from the De Tonty house was put into an account at Roosevelt Federal Savings and Loan Association in the name of Frank as trustee for Frances his wife. At about that same time Frank bought a car for $4,000. He acknowledged that this money also came from the sale of the house on De Tonty. Obviously some of this testimony had to be disbelieved, otherwise the total amount of disbursements from the $18,000 received from the sale of the house comes to about $31,000.

The testimony and exhibits introduced in evidence to prove what happened to the proceeds from the sale of the husband's Italian property is also not clear. Evidence on the sales of the land in Italy came from testimony from the husband and from English translations of several Italian documents. Evidence on openings of bank and savings accounts and later transfers to other accounts came from testimony of Frank and several bank and savings and loan association employees. The wife testified as to some financial dealings but she was generally unaware of what her husband did with money. "He don't tell me his business. He keeps it to himself."

In 1946 after Frank's father died, but before he and Frances were married, a division of the Italian property was made between the members of the husband's family. After this division, it seems that Frank owned four pieces of property by himself and probably two pieces as a joint owner along with others. By himself, he owned a house on Roma Street, a house on Caruso Street and two tracts of unimproved land in or near the city of Cinisi, Italy, on the island of Sicily. One piece of jointly held property was referred to as "the big land" and the other as a house on Roma Street.[2] In 1959 the husband sold his separately owned house on Roma Street for $5,000. In the same year he also sold the house on Caruso Street for $2,800. He testified in 1969 he sold his two tracts of unimproved land for a total of $2,000.[3] Also in 1969, Frank and his sisters sold the other part of the house on Roma Street for $3,800. In 1970 "the big land" was sold but no written record was made of this transaction. The husband said he and his sisters received $18,000 for this property. A witness to part of this transaction, which occurred in St. Louis, said the total amount of money paid to Frank was $18,000. Frances didn't actually see the money but she remembered

---

1. The wife acknowledged that $6,000 of the $18,000 received for the house on De Tonty was used as a down payment on the house on Newton even though the Newton house was purchased in 1960 and the De Tonty house was sold in 1966.

2. Both Roma Street houses have the same address but it appears from the exhibits that they are separate pieces of property, possibly like two condominiums in one building.

3. Although exhibits were introduced to show the sale of the other pieces of property, none show the sale of these two pieces.

Frank telling other people that he got about $40,000 or $50,000 for the land "because his sister got half of it too, the married sister."

Frank testified that some of the money he received from the sale of the Italian property was put into an account at "Roosevelt Federal or St. Louis Federal, some of it" in his name as trustee for his two sisters. It is not clear which sale of property he is referring to or how much was put into this account. Frank also acknowledged that he "acted as trustee in the handling of the affairs of [his] retarded sister," Maria, and that after 1972 he handled some business matters for his other married sister, Marianna Polizzo. He further acknowledged that he carried some of the money he inherited in his name as trustee for his son. He admitted that some indeterminate amount in his accounts came from money he had saved from his earnings. He also said that of the $25,000 to $27,000 in his bank accounts at the time of trial, he owned one-third and each of his two sisters each owned a third.

Frank further testified that a $5,000 McCrory Corporation bearer bond purchased through his account on January 28, 1972, was purchased with his sister Marianna's money and that she had possession of the bond all along, and further that two GAC Property bonds purchased and registered in his name and delivered to him on June 14, 1972, were also purchased with Marianna's money and that the registration was transferred to his sister on August 19, 1974, after divorce proceedings began. Marianna testified through an interpreter that she had requested her brother to purchase these bonds and that she and her husband supplied the money to buy them. She also said none of the money for the bonds came from money she inherited "from Italy." Apparently these bonds would not be included in the property awarded to the husband by the trial court because they were

not "standing in his name or under his control."[4]

Some of the money which had been in various bank and savings and loan association accounts and certificates of deposit during the marriage was still in accounts and certificates at the time of trial while other funds were withdrawn and apparently expended before trial. One certificate of deposit purchased at Mark Twain Northland Bank on February 7, 1966, in the name of Frank and his son was cashed on February 10, 1970, for $5,800. These funds were not accounted for by Frank but this money could have been put into a $5,500 certificate of deposit (number 5000163) at St. Louis Federal Savings and Loan Association in Frank's name as trustee for his sister Maria since such an account was opened there on February 9, 1970, one day before the Mark Twain Bank paid out the certificate for $5,800. This account at St. Louis Federal is still active and at the time of trial had a balance of $7,527.14. In answer to interrogatories Frank made no claim that this money came from the sale of property in Italy, but in his brief on appeal he contends the money in account 5000163 did come from the proceeds of the sale of "the big land" which was sold around February 1970. A second certificate at Mark Twain Northland Bank in the amount of $5,000 in the name of the husband in trust for his son (number 414) was cashed on January 22, 1971, at St. Louis Federal Savings and Loan and used to open a $5,000 account (number 3492) at St. Louis Federal again in the name of the husband as trustee for his son. This account was still open with a balance of $5,631.01 but in August 1975 the name was changed to Frank as trustee for his sister Maria. In answer to interrogatories the husband stated this money came from the sale of inherited property.

Account number 5000163 containing $7,527.14 and account number 3492 contain-

---

4. The husband also purchased a $5,000 Federal Intermediate Credit Bank bond on October 1, 1973, in his name as trustee for his son. On July 1, 1974, when this bond came due he turned it in in exchange for another $5,000 bond which he put in the name of himself and his sister. This bond was due July 1, 1975. The husband testified at trial that this bond "was gone about two years ago" being used to pay for various expenses.

ing $5,631.01 were the only two remaining accounts at St. Louis Federal Savings and Loan. There were also several accounts at Roosevelt Federal Savings and Loan Association. One, passbook account number 4108232, was originally opened under another number on March 3, 1967, in Frank's name as trustee for his son. At the time of trial the balance in 4108232 was $1,641.35. A $7,000 transfer from this account on September 20, 1974, was used to open certificate 4804351 in the name of Frank as trustee for his son. At the time of trial this certificate was worth $7,132.48. A $6,000 transfer from passbook account 4108232 on April 1, 1971, was used to open one certificate of deposit which was later transferred to certificate 4801788, both of which were in the name of Frank as trustee for his son. At the time of trial this certificate was worth $8,011.66. In answer to interrogatories Frank claimed the money in these three accounts came from the sale of inherited property.

Another series of accounts at Roosevelt began in July 1, 1968, in the name of Frank as trustee for his wife. The bank employee who testified concerning these accounts did not know the opening balance but on January 28, 1970, $15,000 from this account was transferred to certificate 4800196 for a higher rate of interest. On January 28, 1974, this certificate, which was still in Frank's name as trustee for his wife, was worth $16,097.77. Eventually all the money was withdrawn from this account. At 5:24 p. m. on August 2, 1974, there was a withdrawal of $3,474.04 and at 6:52 p. m. the same day there was a second withdrawal of $6,000. At 7 p. m. the same day the same teller who handled the two withdrawals accepted deposits totaling $6,400 for account number 4119977. This account was in the name of Salvatore Badalamenti as trustee for Mr. Francesca Badalamenti.[5] The following day another $3,105 was deposited in account 4119977 and then $9,500 was transferred out of this account into a certificate of deposit number 5801332. This certificate was a joint account in the name

of "Salvatore Badalamenti and Francesca Badalamenti." The balance in this account at the time of trial was $10,572.81. On August 5, 1974, an additional $5,000 was withdrawn from account number 4800196 (the one in the name of the husband as trustee for his wife). On January 28, 1975, the remaining balance of this account ($1,923.68) was transferred to an account in the name of Frank as trustee for his son and later, on July 19, 1975, withdrawn by him.

The husband admitted taking out more than $14,000 from account 4800196. He and his nephew, Salvatore Badalamenti, both denied that Frank gave the nephew money to deposit for the husband. Frank said between $8,000 and $12,000 of the money from account 4800196 was spent on a vacation to Florida and the Bahamas in August 1974 with much of the money being lost by gambling. He admitted, however, that he took this vacation following a court hearing on the first divorce suit filed by his wife before that suit was dismissed.

During the course of the marriage Frank made five or six trips to Italy. On two different trips Frank testified he bought his wife a $3,000 diamond watch and a $3,000 set of pearl earrings and necklace. On the last trip in 1970 he took his wife and son along. The family also made a vacation trip to California in 1959. Both parties put on evidence of what could be considered mean, discourteous and disrespectful behavior by one party toward the other. No useful purpose would be served by detailing this evidence.

Frances assessed her financial needs at $529 a month. Her average monthly take-home pay in 1974 was $290, leaving $239 a month that she said she needed from her husband. She earned $2.42 per hour. Her gross yearly earnings from 1971 through 1974 ranged from $2,563.79 to $4,005.96. Both she and her husband had some health problems. The husband was hospitalized several different times and he quit one of

---

**5.** Salvatore Badalamenti is Frank's nephew. Frank is referred to as Francesca Badalamenti in the Italian documents which record the division and sale of his Italian property.

his two jobs after his doctor said "give up one job." In 1974 while working at two jobs, the husband earned about $12,000 in wages before taxes and about $2,000 in interest from various savings accounts. With the one remaining job at the 1974 pay rate the husband would earn about $8,000 a year in wages before taxes, plus some indeterminate amount from interest on savings accounts. In 1972 Frank settled a personal injury claim for $7,000. He received some of this money in 1972, some went toward attorney's fees and some was still being paid to him in installments at the time of trial. Since January 1975, Frank has lived with his two sisters and his brother-in-law.

The standard of review in this court-tried case set out in Rule 73.01 is interpreted by the often quoted case of *Murphy v. Carron,* 536 S.W.2d 30, 32[1, 2] (Mo. banc 1976).

■ The husband's first point on appeal is that the trial court erred in awarding the wife $5,000 in cash because the decree in that respect is not supported by substantial evidence, is against the weight of the evidence and misapplies the law because the husband proved that during the marriage he sold inherited property belonging to him and his sisters for $31,600 and that he "had preserved the proceeds in various bank accounts, which at the time of trial totaled approximately $28,000.00; accordingly [the husband] established that these accounts were not marital property, and the court's award to [the wife] of $5,000.00 from said accounts was prohibited by § 452.330," Supp.1973.

■ One problem in resolving this contention is that neither party requested findings of fact or conclusions of law and none were provided concerning which bank accounts were marital property and which were the separate property of the husband. With regard to the $5,000 cash award, the decree simply states that the wife "is awarded $5,000.00 in cash which sum respondent is ordered to pay to petitioner from one or more of the accounts or certifi-

cates of deposit standing in his name or under his control." The trial court has no duty to make findings of fact or conclusions of law in the absence of a specific request therefor and when no findings or conclusions are made "all fact issues are considered found in accordance with the result reached by the court." *Stark v. Stark,* 539 S.W.2d 779, 781[1] (Mo.App.1976). The husband argues that for the trial court to divide the property the way it did it must have determined that most, if not all, of the money in the bank accounts was marital property. The husband concedes that the house, the car and $1,000 worth of household furnishings are marital property. He claims that the money in the savings accounts was his separate property or at least that it is not marital property.

■ The savings accounts, bonds and debentures in existence at the time of trial were all acquired subsequent to the marriage. As such, this property [6] is presumed to be marital property regardless of the status of the title to the property. Section 452.330.3 RSMo Supp.1973; *Jaeger v. Jaeger,* 547 S.W.2d 207, 210 (Mo.App.1977). However, "[t]he presumption of marital property is overcome by a showing that the property was acquired by a method listed in subsection 2." Section 452.330.3 RSMo Supp.1973. The methods listed in subsection 2 include "(2) Property acquired in exchange for property acquired prior to the marriage or in exchange for property acquired by gifts, bequest, devise, or descent," . . . and "(5) The increase in value of property acquired prior to the marriage."

We agree with the husband's contention that he overcame the presumption that these savings accounts were marital property (simply because they were acquired subsequent to the marriage) because he made "a showing" (as required by § 452.330.3) that the accounts and other liquid assets were "acquired in exchange for property acquired prior to the marriage" and the

---

**6.** Property includes personal property and money. Section 1.020 RSMo 1969; *Cain v. Cain,* 536 S.W.2d 866, 868 (Mo.App.1976).

increase thereof. Section 452.330.2(2), (5). But by making such a showing and overcoming the presumption, the husband merely made the presumption disappear. After this occurred the trier of fact received the issue free of any presumption and "the existence or nonexistence of the fact once presumed is to be determined from the evidence as if no presumption had ever been operative in the case." *J.D. v. M.D.* 453 S.W.2d 661, 663[4] (Mo.App.1970). *See also, In re L——,* 499 S.W.2d 490, 492[2] (Mo. banc 1973); *Terminal Warehouses of St. Joseph, Inc. v. Reiners,* 371 S.W.2d 311, 316–317[4, 5] (Mo.1963).

■ Without the presumption that the bank accounts were marital property, the trial court, as trier of fact, had to decide on the basis of conflicting evidence (including the evidence that gave rise to the presumption and that to the contrary) whether the property was marital property or the separate property of the husband. Evidence tending to show that the money was "[p]roperty acquired in exchange for property acquired prior to the marriage" included the husband's testimony that the Italian land in which he had an interest was sold for a total of about $31,600, that some of the proceeds from these sales went into accounts at Roosevelt Federal or St. Louis Federal and that of the total amount in these accounts (which he says is about $28,000), he owned one-third and his two sisters each owned one-third.[7] Evidence tending to show that the money in the bank accounts was not in exchange for property acquired prior to the marriage but, rather, came from other sources included Frank's testimony that some of the money in these accounts came from money he had saved from his earnings (marital property), his testimony that some of the proceeds from the sale of the Italian land went into the house on Newton, the wife's testimony that $5,000 of the $18,000 received on the sale of the house on De Tonty went into an account in the name of the husband as trustee for

the son (marital property), and the fact that the opening dates of many of the savings accounts do not correspond to the dates when the inherited property was sold. Under these circumstances we cannot say that there was no substantial evidence to support the (implied) trial court judgment that some of these bank accounts were marital property nor that this judgment was against the weight of the evidence or was an erroneous application of the law. Rule 73.01; *Murphy v. Carron,* 536 S.W.2d 30, 32[1, 2] (Mo. banc 1976). Furthermore, where marital and nonmarital property are commingled and then exchanged for new property, the newly acquired asset is marital property regardless of the state of the title of the newly acquired asset. *Jaeger v. Jaeger,* 547 S.W.2d 207, 211[5] (Mo.App. 1977). As stated in that case, at p. 211, "We do not believe that the 'exchange' exception found in § 452.330.2(2) is applicable when a person uses both his pre-marriage property and marital property to purchase new property during the marriage. In commingling his own assets with marital assets, the spouse has failed to sufficiently segregate his own property."

■ In a related issue the husband contends that the wife should be bound by her answers to interrogatories where she did not list the money in these bank accounts as property in which she claimed an interest because her answers were a sworn admission that this money was not marital property. The wife was generally unaware of what her husband did with money and it was not until after she filed her answers to the interrogatories in question that she learned of the bank accounts in the husband's name. She should not be penalized for failing to list the property when she did not know it existed.

There is another reason why the $5,000 award to Frances from the bank accounts and the certificates of deposit standing in Frank's name or under his control is not "prohibited by § 452.330" as asserted by

---

**7.** The husband did not testify, as asserted in his brief, that "he always deposited the proceeds of his Italian land sales in accounts as trustee for

his son or sisters" because he admitted that some of the proceeds went for other purposes, such as toward buying the house on Newton.

him. Frank calculates the total value of such accounts at about $28,000. (There is actually about $29,940 in the accounts he's referring to.) This total fails to include the $10,572.81 in the Roosevelt Federal certificate of deposit number 5801332 in the name of "Salvatore Badalamenti and Francesca Badalamenti." Competent and substantial evidence showed that the money for this certificate came from Roosevelt Federal certificate 4800196 which was in the name of Frank as trustee for his wife and that at all times these funds were marital property. The husband never claimed this money came from proceeds from the sale of inherited property; he simply denied that any funds from certificate 4800196 had been put into an account in the name of his nephew Salvatore. Thus even if we were to hold that all of the other accounts were the separate property of the husband, the $5,000 award to the wife could still be paid out of certificate 5801332 since this money was marital property.

■ The husband's second contention is that the trial court erred in awarding the wife "all or virtually all of the marital property, and the decree in that respect is not supported by substantial evidence, is against the weight of the evidence, and misapplies the law, because the award is grossly disproportionate, ignores [the husband's] contribution to the acquisition of the property, ignores [his] obligation to support the minor child, and ignores [the wife's] misconduct during the marriage."

According to the husband's calculations, the wife received the house valued at about $26,000, the car valued at $1,000, household furnishings valued at $1,000 and $5,000 in cash, for a total of about $33,000, and he received about $23,000 in cash. This assumes that there was a total of about $28,000 in cash. But as mentioned above, this $28,000 figure does not include the $10,572.81 in Roosevelt Federal certificate of deposit 5801332 in the name of "Salvatore Badalamenti and Francesca Badalamenti" which amount should be included in the total cash assets standing in his name or under his control. Taking the revised fig-

ure of about $38,500 as the total cash assets, the husband received about $33,500 by the trial court's decree.

Adding the value of certificate 5801332 to the value of the other marital property makes a total of about $38,500 that had to be considered marital property ($26,000 for the house, $1,000 for the car, $1,000 for furnishings and $10,500 in cash). An additional $5,600 (the approximate difference between $16,100 and $10,500) also could have been properly included in the couple's marital property at the time of trial because the entire amount of $16,100 in certificate 4800196 as of January 1974 could have been included in the marital estate. Substantial withdrawals from this account in August 1974 following a court hearing on the first divorce petition filed by the wife and the subsequent lavish vacation during the pendency of that suit were circumstances that evidenced an attempt by the husband to defeat the wife's rights in this marital property. These withdrawals could be disregarded by the trial court. *Daniels v. Daniels,* 557 S.W.2d 702, 704[3] (Mo.App. 1977). When this extra $5,600 is added to the value of the rest of the marital property, the total value of marital property is about $44,100.

The value of all other certificates and accounts, other than certificate 5801332, is about $29,900. The husband claimed that he owned only a third, or about $9,960 of this amount. If this is true then he received $9,960 as his separate property and about $11,100 in marital property ($16,100 from certificate 4800196 minus $5,000 awarded to the wife or, figured another way, $5,500 as the difference between $10,500 and $5,000 plus $5,600 withdrawn from certificate 4800196 and not accounted for), for a total of about $21,060 for the husband. But, as discussed above, the court could reasonably find that some of the accounts and certificates in the husband's name, other than certificate 5801332, were also marital property. And as the trier of fact and the judge of the credibility of the witnesses, even if testimony is uncontradicted, *Jaeger v. Jaeger,* 547 S.W.2d 207, 213[9] (Mo.App.

1977), the trial court was not required to believe the husband's assertion that he only owned one-third of the $29,900 and each of his two sisters each owned a third particularly where there was competent and substantial evidence that much of this money came from sources other than the sale of inherited property and the fact that the name of his sister Marianna never appears on any of these accounts or certificates. If an additional $10,000 to $15,000 from these accounts is added to the previous total of $21,060 for the husband, there is a total award to him (without distinguishing between marital and separate property) of between $31,060 and $36,060 as compared with a total of about $33,000 to the wife.

■ The discussion just concluded considers the evidence in light of the second statutory factor, "[t]he value of the property set apart to each spouse," § 452.330.1(2) RSMo Supp.1973, of the four nonexclusive, *Lockett v. Lockett,* 558 S.W.2d 387, 388[2] (Mo.App.1977), factors listed in § 452.330.1 which must be considered by the trial court when making a "just" division of marital property. The statute does not mandate that the division of marital property "be done with mathematical nicety by means of a stereotyped mathematical formula." *In re the Marriage of Vanet,* 544 S.W.2d 236, 240[2] (Mo.App.1976). Rather this division is a matter within the discretion of the trial court and will not be disturbed on appeal absent a showing of an abuse of discretion. *In re the Marriage of Vanet, supra* at 240[3].

Concerning the first factor, "[t]he contribution of each spouse to the acquisition of the marital property, including the contribution of a spouse as homemaker" (§ 452.-330.1(1)), it appears that the husband was the principal breadwinner throughout most of the marriage, for several years working at two jobs. He made the house payments and paid the utility bills. However, the wife also worked and paid for some of the family expenses. She, along with her mother, cleaned the house and cooked the meals except for a period before the husband moved out when he had to cook his own food and do his own laundry. As for the third factor, the economic circumstances of each spouse (§ 452.330.1(3)), the evidence showed that the husband had a higher income than his wife, even while working at just one job. Both parties had some health problems, with the husband's appearing more severe. It seems that the son would soon be on his own. Concerning the fourth factor, the conduct of the parties during the marriage (§ 452.330.1(4)), there was much evidence indicating that both parties were less than good and kind toward each other. But considering all of this evidence, which we do not describe in detail, it seems that neither party appears much better than the other. A consideration of all these factors leads us to the conclusion that the trial court's division of marital property was not an abuse of discretion in this case.

■ The husband's third point on appeal charges error in that portion of the trial court decree awarding $150 per month maintenance to the wife. An award of maintenance may only be granted if the trial court finds that the spouse seeking maintenance lacks sufficient property, including marital property, to provide for his reasonable needs and is unable to support himself through appropriate employment. Section 452.335.1 RSMo Supp.1973. Of the property awarded the wife, only the $5,000 in cash was income producing. The property awarded to the wife is not sufficient to provide for her reasonable needs. Her annual gross earnings from doing hand sewing from 1971 through 1974 ranged from $2,563.79 to $4,005.96. These earnings are not sufficient for her to support herself. Thus it was appropriate for the trial court to make an award of maintenance. In view of the wife's financial needs, the husband's gross wages of about $8,000 in 1974 (about double that of the wife's), and the amount of liquid assets awarded to the husband, it appears that the maintenance award of $150 a month to the wife was justified. Section 452.335.2 RSMo Supp.1973. The amount of this award was a reasonable balance between the husband's ability to pay and the wife's reasonable needs, *Farns-*

*worth v. Farnsworth,* 553 S.W.2d 485, 487[4] (Mo.App.1977), and was not an abuse of discretion. *McCully v. McCully,* 550 S.W.2d 911, 914[8] (Mo.App.1977).

The judgment is affirmed.

GUNN, P. J., and KELLY, J., concur.