Sims G. **DILDY, Petitioner-Respondent,**

v.

**Marnelle T. DILDY,**
**Respondent-Appellant.**

**No. 12645.**

Missouri Court of Appeals,
Southern District,
Division One.

March 29, 1983.

Loren R. Honecker, Springfield, for respondent-appellant.

John R. Lewis, Mark D. Wheatley, Springfield, for petitioner-respondent.

FLANIGAN, Presiding Judge.

This action for dissolution of marriage was instituted by Sims G. Dildy, petitioner below and respondent here, against his wife Marnelle T. Dildy, respondent below and appellant here. The parties will be referred to by their first names.

Marnelle's first point challenges the propriety of the trial court's treatment of certain shares of stock in various corporations listed in "Security Account No. 59910703" with the investment firm of Merrill Lynch, Pierce, Fenner & Smith, Inc. The security account was held in the names of Sims and Marnelle as "joint tenants with right of survivorship." The trial court treated as "marital property" (§ 452.330, par. 2)[1] shares in the security account having an aggregate value of $21,616. The remaining shares in the security account, having an aggregate value of $30,211, were set aside to Sims, as "his property" or as "nonmarital property." It is the position of Marnelle that all of the shares in the security account were "marital property" and should have been divided in the manner prescribed by § 452.330, par. 1.

The parties were married on April 11, 1959, and separated in the summer of 1980. The dissolution action was filed in June 1980 and tried in September 1981. The stocks listed in the security account had a market value, on August 28, 1981, of $51,827 and consisted of holdings in 12 corporations. The trial court set aside to Sims all of the shares in three corporations and some of the shares in four corporations, as shown by the following table:

| Corporation | Column 1<br>Shares in<br>Security Account<br>No. 59910703 | Column 2<br>Shares set aside<br>to Sims as non-<br>marital property | Column 3<br>Shares treated<br>as marital<br>property |
|---|---|---|---|
| Altec Corp. | 400 | 400 | |
| Ark–La Gas | 200 | 124 | 76 |
| Carolina Power LGT | 25 | | 25 |

---

1. All references to statutes are to RSMo 1978, V.A.M.S.

| Corporation | Column 1 Shares in Security Account No. 59910703 | Column 2 Shares set aside to Sims as non-marital property | Column 3 Shares treated as marital property |
|---|---|---|---|
| Colt Inds. Inc. | 104 | | 104 |
| E Systems Inc. New | 400 | 400 | |
| Safeguard Scientifics | 50 | | 50 |
| Safeg. Bus. Syst. | 75 | | 75 |
| Seneca Oil Co. | 200 | 200 | |
| So. Cal. Edison | 100 | 48 | 52 |
| Std. Oil of Calif. | 80 | 40 | 40 |
| Texas Instruments | 50 | 20 | 30 |
| Union Carbide Corp. | 50 | | 50 |
| Aggregate value | $51,867 | $30,211 | $21,616 |

Prior to the marriage Sims owned the shares shown in column 2. At the time of trial all of the shares shown in column 1, according to Sims, were carried in the name of Merrill Lynch, the brokerage firm, that is, in the "street" name. Sims testified that the security account was opened in 1978 or 1979 pursuant to discussions between him and Marnelle. Marnelle told Sims that "she could take more interest in the financial end of the family if some of the things were in her name so I agreed to lump these stocks together. At one time we had two accounts with Merrill Lynch, a joint account and a single account, and Marnelle said she did not feel like it was part of the family. I agreed to put the whole bevy of stocks in one account under joint names."

Sims testified that he purchased the Altec stock in 1953. During direct examination by his own attorney Sims gave the following testimony: "Q. At the time that you placed the Altec Corporation stock into the joint account, did you have any intention of making your wife a gift of that stock—or those stock certificates? A. Not per se." Sims testified that he considered 124 shares of Ark-La Gas to be nonmarital property "because it was purchased prior to the marriage and that same reason applies to all of them," i.e. the rest of column 2.

There was no testimony with regard to the handling of the original certificates represented by column 2. With respect to column 1, Sims said that the shares "were titled in Merrill Lynch's name." On cross-examination Sims admitted that in answering a set of interrogatories he had referred to all of the shares shown in column 1 as "jointly owned stocks."

There was no evidence concerning what documents, if any, were executed in conjunction with the opening of account 59910703. Sims testified that "in September 1979 I asked Merrill Lynch to put Marnelle's name on the account to all the stocks that appear in [column 1]. That is when I put them in the joint account." Marnelle testified that she did not remember whether she signed "any papers" at the time "the security account was placed in joint names."

There was evidence that other stock holdings of Sims, including some acquired by him prior to the marriage, were retained in his sole name. The parties agreed that those holdings were nonmarital property. Although Sims kept a meticulous history of the respective sources and descriptions of those stocks, and others which were inherited by Sims during the marriage, he made no mention of the sources or dates of acquisition of the stocks shown in column 3 which, both parties concede, were marital property.

The statement issued by Merrill Lynch, showing the condition of security account 59910703 on August 28, 1981, listed the share holdings as they are listed in column 1. On that statement, prior to the trial, Sims made marginal notations so as to set forth the information shown in column 2. Sims had another Merrill Lynch account, No. 59911388, which was carried in his sole name, and Marnelle does not challenge the trial court's treatment of that account as nonmarital property.

The issue is whether the stocks shown in column 2, which (or at least their equivalents) were owned by Sims prior to the marriage, became marital property by reason of the conduct of Sims in placing them in security account 59910703. The issue must be considered in light of the following combination of factors: (a) the security account was titled in Sims and Marnelle as joint tenants; (b) the security account contained other stocks which were admittedly marital property; and (c) all of the stocks in the security account were titled in the street name of Merrill Lynch.[2] For the reasons which follow, this court holds that all of the stock in the security account, including those listed in column 2, were marital property and that Marnelle's first point is sound.

Missouri cases dealing with the classification of corporate stock as marital property or nonmarital property for dissolution purposes include *Davis v. Davis*, 544 S.W.2d 259 (Mo.App.1976); *Jaeger v. Jaeger*, 547 S.W.2d 207 (Mo.App.1977); and *Hebron v. Hebron*, 566 S.W.2d 829 (Mo.App.1978).

In *Davis* the husband acquired stock in an oil company before the marriage. The title to the stock remained in the husband during the marriage. Although recognizing the principle that "the conduct of the parties with respect to property may evidence the clear intention that separate property be contributed to the community or the other spouse," the court held there was no evidence to show that the "status" of the oil company stock changed during the marriage and it remained separate property.

In *Jaeger* the court held: (1) stocks owned by the husband prior to the marriage, "which had been retained solely in his name throughout the marriage" and "retained their identity as [the husband's own property]," were separate property; (2) stocks acquired during the marriage with funds not shown to be derived from the husband's separate property were marital property because property acquired during the marriage is presumed to be marital property and the person attempting to overcome the presumption failed to carry the burden of showing that the property "comes within the exceptions listed in § 452.330, par. 2"; (3) stocks acquired during the marriage from funds derived from the commingled sale of separate and marital property were marital property irrespective of the state of title to the newly acquired assets. With regard to category (3) the court held that the "exchange" exception found in § 452.330, par. 2(2), did not apply when a person uses both his pre-marriage property and marital property to purchase new property during the marriage. The court said, at p. 211: "In commingling his own assets with marital assets, the spouse has failed to sufficiently segregate his own property. Such a commingling is indicative of an intent on the part of the owner of the pre-marriage property to contribute it to the marital estate. Thus, the new assets procured from these commingled proceeds must be regarded as marital property."[3]

---

**2.** In the instant case there was no showing that the stocks held in the security account were transferred to the joint names of Sims and Marnelle on the corporate books of the various corporations listed. See 6 A.L.R. 4th 250—"Transfer on corporate books as sufficient for gift of stock." Also there was no showing that stock certificates representing the various holdings in the security account were issued to Sims and Marnelle as joint tenants. See 5 A.L.R. 4th 373—"Issuance of stock certificate to joint tenants as creating gift inter vivos."

**3.** "[W]here marital property and nonmarital property are commingled and then exchanged for new property, the newly acquired asset is marital property regardless of the state of the title of the newly acquired asset." *Marriage of*

In *Hebron* the following stocks were held to be marital property: (1) shares of American General stock purchased during the marriage, titled jointly in the husband and wife, but paid for in part by the proceeds of the sale of land which had been given to the wife but which the wife conveyed to herself and her husband before the land was sold; (2) 357 shares given to the husband and wife "in their joint names," shortly after the marriage, by the wife's father. The court pointed out that "a gift to both spouses is presumed to be marital property." One of two such presumptions, said the court, is created by § 452.330, par. 3, and "clear and convincing" evidence is required to overcome that presumption. The court also held that other stock held in the name of the wife alone was nonmarital property when it was purchased by the wife during the marriage but with funds given her as a gift from her father "during the period when problems with the marriage became apparent." With respect to this stock the court said that the foregoing evidence, "plus the absence of any evidence *such as commingling the stock with marital assets . . . or later placing it in joint names,* showing an intent to contribute the stock to the marital estate, overcomes the presumption of marital property, § 452.330.3 and establishes that it was a gift to her alone. § 452.330.2(1)." (Emphasis added.)

Other Missouri cases, although not dissolution cases, are instructive on the issue under scrutiny. They are *In re Estate of Wintermann,* 492 S.W.2d 763 (Mo.1973), and *Roth v. Roth,* 571 S.W.2d 659 (Mo.App. 1978). In *Wintermann* the court held that there was a valid gift, from sister to sister, of 100 shares of stock although the certificate remained in the possession of the donor until her death and thereafter was in the possession of the donor's executor. The court pointed out that the essentials of an inter vivos gift of personal property are "a present intention to make a gift on the part of the donor, a delivery of the property by the donor to the donee, and an acceptance by the donee, whose ownership takes effect immediately and absolutely." The court said that the donor's intention and the donee's acceptance were adequately proved by statements of the donor concerning the gift, the assignment of the shares to the donee, the transfer of the shares to the donee on the books of the corporation, and the issuance of a certificate in the donee's name. There was also a showing that the donee exercised rights of ownership including receipt of dividends.

On the issue of delivery, the court pointed out that delivery may be actual, constructive or symbolical. The court quoted the following language from *Rumsey v. Otis,* 133 Mo. 85, 34 S.W. 551, 553 (1896):

"[N]o particular form is necessary to effect a delivery. The delivery itself is only intended to evidence the purpose of the grantor to give effect to the instrument, and the law presumes much more in favor of a delivery in cases of voluntary settlements in favor of a *wife,* child, or near relative than it does in ordinary cases of bargain and sale between strangers." (Emphasis added.)

The court in *Wintermann* held that "less proof is required to show delivery as between parties within a family relationship." In upholding the gift the court said that "each case of this nature must be decided upon the particular facts appearing therein," and mentioned the following facts as showing a constructive delivery: statements by the donor that she had given the stock to the donee and that the certificate would be delivered; issuance of the certificate, at the donor's instance, to the donee in the donee's name; retention by the donee of dividends; the close family relationship between the donor and the donee.

In *Roth* litigation arose between Roland Roth and his mother, Anna. One issue the court dealt with was whether Anna made a gift to Roland by placing certain shares of stock in the joint names of Anna and Roland. The court cited *Firestone v. Yoffie,* 494 S.W.2d 394 (Mo.App.1973), for the proposition that there is a completed gift of

*Badalamenti,* 566 S.W.2d 229, 236[4] (Mo.App. 1978).

corporate shares when, by direction of the owner, they are transferred to the donee on the books of the corporation and new certificates are issued in the name of the donee even though the new certificates are retained by the donor and not delivered to the donee.

The court in *Roth* said, at p. 667:

"Two elements are of the greatest importance in determination of donative intent: (1) transfer of ownership into the donee's name on the corporation's books; and (2) the existence of a parent-child relationship. Both elements are present here. The transfer to Roland from his mother made him a joint tenant instead of sole owner but there was a transfer of ownership to the extent of the joint tenancy.

.        .        .        .        .

[T]he transfer on the books to a joint tenancy, or the purchase as joint tenants, evidences donative intent on Anna's part."

The court also held that there was a constructive delivery although the stock certificate was kept in Anna's safety deposit box and that the element of acceptance could be presumed because of the benefit to Roland.

■ By agreement or by gift, a spouse may transmute an item of separate property into marital property. *Daniels v. Daniels,* 557 S.W.2d 702, 704 (Mo.App.1977). The Missouri Dissolution of Marriage Act does not prohibit one spouse from making a gift to the other spouse, and this principle includes a gift of separate property acquired by the donor-spouse prior to the marriage. *Conrad v. Bowers,* 533 S.W.2d 614, 621 (Mo.App.1975). Section 452.330, par. 2 defines "marital property" as "all property acquired by either spouse subsequent to the marriage," with five exceptions, one of which is "(1) property acquired by gift, bequest, devise or descent." The foregoing exception does not apply to a gift to *both* spouses. *Forsythe v. Forsythe,* 558 S.W.2d 675, 678 (Mo.App.1977). Gifts received by spouses and placed in their joint names "would be presumed marital property." *In re Marriage of Brewer,* 592 S.W.2d 529, 533 (Mo.App.1979).

If, as this court holds, all of the stock in the security account, including those listed in column 2, were marital property, it is of no moment that the joint account was created at Marnelle's request. *Smith v. Smith,* 561 S.W.2d 714, 717[3] (Mo.App.1978).

■ Sims concedes that the stocks in column 3 are marital property. The stocks in column 2 are also marital property because the record supports a finding that they were the subject of an inter vivos gift from Sims to Sims and Marnelle as joint tenants. In reaching that conclusion this court has considered the following factors:

1. Sims agreed, and took the necessary steps, to "put the whole bevy of stocks in one account under joint names." Asked by his own attorney if he then intended to make his wife a gift of the column 2 stocks, Sims gave the equivocal answer, "not per se." Sims was acutely aware of the difference between a one-name account and a joint account.

2. Sims's premarital stocks (or their equivalents), which were placed in the security account and are listed in column 2, were commingled with stocks which were admittedly marital property. The column 2 stocks no longer "retained their identity" as Sims's own property.

3. Although, at least so far as the record shows, there was no re-registration of the stocks on the books of the various corporations, the title to the security account of Merrill Lynch was changed to a joint tenancy of Sims and Marnelle. Although the stocks themselves were held in "street name," that of Merrill Lynch, that fact does not favor Sims more than it does Marnelle. The statement of the security account, sent by Merrill Lynch and reflecting the status of the account, was addressed to the joint tenants.

4. The willingness of Marnelle to accept the joint tenancy is graphically demonstrated by the fact that she induced its creation.

The elements of donative intent and acceptance by the donee are present. There was at least a constructive delivery, the

type of delivery to which the nature of the account lent itself.

The trial court erred in failing to treat the column 2 holdings as marital property. Some cases hold that this error is not necessarily reversible error if the trial court "reached a correct result." *Miller v. Miller,* 635 S.W.2d 350, 352[7] (Mo.App.1982). See also *Rasmussen v. Rasmussen,* 627 S.W.2d 117, 121 (Mo.App.1982); *Smith v. Smith,* 561 S.W.2d 714, 718[7] (Mo.App.1978). Under Rule 84.14 this court may "give such judgment as the court ought to give" but on the instant record this court has concluded to reverse and remand.

The column 2 holdings had a value, in 1981, of $30,211. Although in the trial court and on appeal the parties disagreed as to the classification of certain assets as marital or nonmarital property, they generally agreed, or at least did not disagree, on their respective values. According to Marnelle's brief the trial court set apart to Sims as nonmarital property (including the column 2 holdings) assets totaling $103,000 and set apart to Marnelle "no separate property whatever." According to Sims's brief the trial court awarded Marnelle $49,950.35 as her share of the marital property and awarded Sims $50,728.93 as his share. Neither side has disputed the other's figures. The trial court's decree required Sims to pay Marnelle $525 per month as maintenance.

The value of nonmarital property set apart to each spouse is one of the relevant factors which the trial court must consider in dividing the marital property. § 452.330, par. 1(2). Before awarding maintenance the trial court must consider, among other relevant factors, "the financial resources of the party seeking maintenance, including marital property apportioned to him." § 452.335, par. 2(1).

At the time of the marriage Sims was a member of the U.S. Air Force and he continued on active duty until 1976 when he retired with the rank of lieutenant colonel. Since his retirement Sims has received a substantial military pension. The trial court's decree treated that pension as non-marital property of Sims. That treatment, at the time of the trial court's decree, was proper in light of *McCarty v. McCarty,* 453 U.S. 210, 101 S.Ct. 2728, 69 L.Ed.2d 589 (1981), which was decided June 26, 1981. In *McCarty* the court held that federal law precludes a state court from dividing military nondisability retirement pay pursuant to state community property laws. In *Pruitt v. Pruitt,* 622 S.W.2d 767, 768–69 (Mo.App.1981), the eastern district of this court held that *McCarty* prohibited the treatment "of husband's retirement pay as marital property in Missouri.... This is true whether the pay is actually divided (as was the case in *McCarty*) or used as an offset to other marital property awarded to the other spouse."

On September 8, 1982, the President signed into law the "Uniformed Services Former Spouses' Protection Act," Pub.L. No. 97–252, 96 Stat. 730 (1982), which now appears in 10 U.S.C.A. § 1408, and will be referred to as "the Act." The Supreme Court of Texas has said: "The purpose of the act was to reverse the effect of the *McCarty* decision. Under the act, a divorce court may divide military retirement pay between the spouses in accordance with the law of the jurisdiction of the court. The act limits such division of retirement pay to periods beginning after June 25, 1981." *Cameron v. Cameron,* 641 S.W.2d 210, 212–13 (Tex.1982).

Under the foregoing circumstances this court concludes that the parties should have the opportunity to present, on remand to the trial court, their respective positions and evidence concerning the issues of maintenance and disposition of property, including their positions on what impact, if any, the Act may have on these proceedings.

Those portions of the decree which dissolved the marriage, pertained to the custody and visitation of the child Christine, awarded $2,500 as attorney's fees to Marnelle and restored Marnelle's maiden name are affirmed. All other portions of the decree are reversed and remanded for further proceedings consistent with this opinion. It is so ordered.

GREENE, C.J., and TITUS, J., concur.

CROW, J., disqualified.