## McCARTY $v.$ McCARTY

No. 80–5. Argued March 2, 1981—Decided June 26, 1981

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, MARSHALL, POWELL, and STEVENS, JJ., joined. REHNQUIST, J., filed a dissenting opinion, in which BRENNAN and STEWART, JJ., joined, *post,* p. 236.

*Mattaniah Eytan* argued the cause and filed briefs for appellant.

*Walter T. Winter* argued the cause for appellee. With him on the brief was *Barbara R. Dornan.**

JUSTICE BLACKMUN delivered the opinion of the Court.

A regular or reserve commissioned officer of the United States Army who retires after 20 years of service is entitled to retired pay. 10 U. S. C. §§ 3911 and 3929. The question presented by this case is whether, upon the dissolution of a marriage, federal law precludes a state court from dividing military nondisability retired pay pursuant to state community property laws.

I

Although *disability* pensions have been provided to military veterans from the Revolutionary War period to the

---

*\*Herbert N. Harmon* filed a brief for the Non-Commissioned Officers Association of the United States of America et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *William H. Allen* for John L. Burton et al.; and by *Gertrude D. Chern, Judith I. Avner, Gill Deford,* and *Neal Dudovitz* for the National Organization for Women Legal Defense and Education Fund et al.

present,[1] it was not until the War Between the States that Congress enacted the first comprehensive *nondisability* military retirement legislation. See Preliminary Review of Military Retirement Systems: Hearings before the Military Compensation Subcommittee of the House Committee on Armed Services, 95th Cong., 1st and 2d Sess., 5 (1977–1978) (Military Retirement Hearings) (statement of Col. Leon S. Hirsh, Jr., USAF, Director of Compensation, Office of the Assistant Secretary of Defense for Manpower, Reserve Affairs, and Logistics); Subcommittee on Retirement Income and Employment, House Select Committee on Aging, Women and Retirement Income Programs: Current Issues of Equity and Adequacy, 96th Cong., 1st Sess., 15 (Comm. Print 1979) (Women and Retirement). Sections 15 and 21 of the Act of Aug. 3, 1861, 12 Stat. 289, 290, provided that any Army, Navy, or Marine Corps officer with 40 years of service could apply to the President to be retired with pay; in addition, §§ 16 and 22' of that Act authorized the involuntary retirement with pay of any officer "incapable of performing the duties of his office." 12 Stat. 289, 290.

The impetus for this legislation was the need to encourage or force the retirement of officers who were not fit for wartime duty.[2] Women and Retirement, at 15. Thus, from

---

[1] See Rombauer, Marital Status and Eligibility for Federal Statutory Income Benefits: A Historical Survey, 52 Wash. L. Rev. 227, 228–229 (1977). The current military disability provisions are 10 U. S. C. § 1201 *et seq.* (1976 ed. and Supp. IV).

[2] See Cong. Globe, 37th Cong., 1st Sess., 16 (1861) (remarks of Sen. Grimes) ("some of the commanders of regiments in the regular service are utterly incapacitated for the performance of their duty, and they ought to be retired upon some terms, and efficient men placed in their stead"); *id.,* at 159 (remarks of Sen. Wilson) ("We have colonels, lieutenant colonels, and majors in the Army, old men, worn out by exposure in the service, who cannot perform their duties; men who ought to be honorably retired, and receive the compensation provided for in this measure").

its inception,[3] the military nondisability retirement system has been "as much a personnel management tool as an income maintenance method," *id.*, at 16; the system was and is designed not only to provide for retired officers, but also to ensure a "young and vigorous" military force, to create an orderly pattern of promotion, and to serve as a recruiting and re-enlistment inducement. Military Retirement Hearings, at 4–6, 13 (statement of Col. Hirsh).

Under current law, there are three basic forms of military retirement: nondisability retirement; disability retirement; and reserve retirement. See *id.*, at 4. For our present purposes, only the first of these three forms is relevant.[4] Since each of the military services has substantially the same nondisability retirement system, see *id.*, at 5, the Army's system may be taken as typical.[5] An Army officer who has 20 years of service, at least 10 of which have been active service as a commissioned officer, may request that the Secretary of the

---

[3] For a survey of subsequent military nondisability legislation, see U. S. Dept. of Defense, Military Compensation Background Papers, Third Quadrennial Review of Military Compensation 183–202 (1976); Military Retirement Hearings, at 12–13.

[4] For an overview of the disability and reserve retirement systems, see Subcommittee on Investigations, House Committee on Post Office and Civil Service, Dual Compensation Paid to Retired Uniformed Services' Personnel in Federal Civilian Positions, 95th Cong., 2d Sess., 18–20 (Comm. Print 1978).

[5] The voluntary nondisability retirement systems of the various services are codified as follows: 10 U. S. C., ch. 367, § 3911 *et seq.* (1976 ed. and Supp. IV) (Army); ch. 571, § 6321 *et seq.* (1976 ed. and Supp. IV) (Navy and Marine Corps); ch. 867, § 8911 *et seq.* (Air Force). The nondisability retirement system was recently amended by the Defense Officer Personnel Management Act, Pub. L. 96–513, 94 Stat. 2835. Under § 111 of that Act, *id.*, at 2875, 10 U. S. C. § 1251 (1976 ed., Supp. IV), regular commissioned officers in all the military services are required, with some exceptions, to retire at age 62; the Act also amended various provisions dealing with involuntary nondisability retirement for length of service. The Act, however, did not affect the particular voluntary nondisability retirement provisions at issue here.

Army retire him. 10 U. S. C. § 3911.[6] An officer who requests such retirement is entitled to "retired pay." This is calculated on the basis of the number of years served and rank achieved. §§ 3929 and 3991.[7] An officer who serves for less than 20 years is not entitled to retired pay.

The nondisability retirement system is noncontributory in that neither the service member nor the Federal Government makes periodic contributions to any fund during the period of active service; instead, retired pay is funded by annual appropriations. Military Retirement Hearings, at 5. In contrast, since 1957, military personnel have been required to contribute to the Social Security System. Pub. L. 84–881, 70 Stat. 870. See 42 U. S. C. §§ 410 (*l*) and (m). Upon satisfying the necessary age requirements, the Army retiree, the

---

[6] An enlisted member of the Army may be retired upon his request after 30 years of service. 10 U. S. C. § 3917. See also § 3914, as amended by the Military Personnel and Compensation Amendments of 1980, Pub. L. 96–343, § 9 (a)(1), 94 Stat. 1128, 10 U. S. C. § 3914 (1976 ed., Supp. IV) (voluntary retirement after 20 years followed by service in Army Reserve). A retired enlisted member is also entitled to retired pay. 10 U. S. C. §§ 3929 and 3991.

[7] The amount of retired pay is calculated according to formula: (basic pay of the retired grade of the member) $\times$ ($2\frac{1}{2}\%$) $\times$ (the number of years of creditable service). Thus, a retiree is eligible for at least 50% ($2\frac{1}{2}\% \times 20$ years of service) of his or her basic pay, which does not include special pay and allowances. There is, however, an upper limit of 75% of basic pay—the percentage attained upon retirement after completion of 30 years of service (30 years $\times$ $2\frac{1}{2}\%$)—regardless of the number of years actually served. See 10 U. S. C. § 3991. See generally Women and Retirement, at 16. The amount of retired pay is adjusted for any increase in the Consumer Price Index. § 1401a.

Since the initiation of this suit, § 3991 has been amended twice. See the Department of Defense Authorization Act, 1981, Pub. L. 96–342, § 813 (c), 94 Stat. 1104, and the Defense Officer Personnel Management Act, Pub. L. 96–513, § 502 (21), 94 Stat. 2910. Neither amendment has any bearing here.

Under the Internal Revenue Code of 1954, retired pay is taxable as ordinary income when received. 26 U. S. C. § 61 (a)(11); 26 CFR § 1.61–11 (1980).

spouse, an ex-spouse who was married to the retiree for at least 10 years, and any dependent children are entitled to Social Security benefits. See 42 U. S. C. §§ 402 (a) to (f) (1976 ed. and Supp. IV).

Military retired pay terminates with the retired service member's death, and does not pass to the member's heirs. The member, however, may designate a beneficiary to receive any arrearages that remain unpaid at death. 10 U. S. C. § 2771. In addition, there are statutory schemes that allow a service member to set aside a portion of the member's retired pay for his or her survivors. The first such scheme, now known as the Retired Serviceman's Family Protection Plan (RSFPP), was established in 1953. Act of Aug. 8, 1953, 67 Stat. 501, current version at 10 U. S. C. §§ 1431–1446 (1976 ed. and Supp. IV). Under the RSFPP, the military member could elect to reduce his or her retired pay in order to provide, at death, an annuity for a surviving spouse or child. Participation in the RSFPP was voluntary, and the participating member, prior to receiving retired pay, could revoke the election in order "to reflect a change in the marital or dependency status of the member or his family that is caused by death, divorce, annulment, remarriage, or acquisition of a child . . . ." § 1431 (c). Further, deductions from retired pay automatically cease upon the death or divorce of the service member's spouse. § 1434 (c).

Because the RSFPP was self-financing, it required the deduction of a substantial portion of the service member's retired pay; consequently, only about 15% of eligible military retirees participated in the plan. See H. R. Rep. No. 92–481, pp. 4–5 (1971); S. Rep. No. 92–1089, p. 11 (1972). In order to remedy this situation, Congress enacted the Survivor Benefit Plan (SBP) in 1972. Pub. L. 92–425, 86 Stat. 706, codified, as amended, at 10 U. S. C. §§ 1447–1455 (1976 ed. and Supp. IV). Participation in this plan is automatic unless the service member chooses to opt out. § 1448 (a).

The SBP is not entirely self-financing; instead, the Government contributes to the plan, thereby rendering participation in the SBP less expensive for the service member than participation in the RSFPP. Participants in the RSFPP were given the option of continuing under that plan or of enrolling in the SBP. Pub. L. 92–425, § 3, 86 Stat. 711, as amended by Pub. L. 93–155, § 804, 87 Stat. 615.

## II

Appellant Richard John McCarty and appellee Patricia Ann McCarty were married in Portland, Ore., on March 23, 1957, while appellant was in his second year in medical school at the University of Oregon. During his fourth year in medical school, appellant commenced active duty in the United States Army. Upon graduation, he was assigned to successive tours of duty in Pennsylvania, Hawaii, Washington, D. C., California, and Texas. After completing his duty in Texas, appellant was assigned to Letterman Hospital on the Presidio Military Reservation in San Francisco, where he became Chief of Cardiology. At the time this suit was instituted in 1976, appellant held the rank of Colonel and had served approximately 18 of the 20 years required under 10 U. S. C. § 3911 for retirement with pay.

Appellant and appellee separated on October 31, 1976. On December 1 of that year, appellant filed a petition in the Superior Court of California in and for the City and County of San Francisco requesting dissolution of the marriage. Under California law, a court granting dissolution of a marriage must divide "the community property and the quasi-community property of the parties." Cal. Civ. Code Ann. § 4800 (a) (West Supp. 1981). Like seven other States, California treats all property earned by either spouse during the marriage as community property; each spouse is deemed to make an equal contribution to the marital enterprise, and therefore each is entitled to share equally in its assets. See

*Hisquierdo* v. *Hisquierdo,* 439 U. S. 572, 577–578 (1979). "Quasi-community property" is defined as

> "all real or personal property, wherever situated heretofore or hereafter acquired . . . [b]y either spouse while domiciled elsewhere which would have been community property if the spouse who acquired the property had been domiciled in [California] at the time of its acquisition." Cal. Civ. Code Ann. § 4803 (West Supp. 1981).

Upon dissolution of a marriage, each spouse has an equal and absolute right to a half interest in all community and quasi-community property; in contrast, each spouse retains his or her separate property, which includes assets the spouse owned before marriage or acquired separately during marriage through gift. See *Hisquierdo,* 439 U. S., at 578.

In his dissolution petition, appellant requested that all listed assets, including "[a]ll military retirement benefits," be confirmed to him as his separate property. App. 2. In her response, appellee also requested dissolution of the marriage, but contended that appellant had no separate property and that therefore his military retirement benefits were "subject to disposition by the court in this proceeding." [8] *Id.,* at 8–9. On November 23, 1977, the Superior Court entered findings of fact and conclusions of law holding that appellant was entitled to an interlocutory judgment dissolv-

---

[8] At the time the interlocutory judgment of dissolution was entered, appellant had not begun to receive retired pay, since he had not yet completed 20 years of active service. Under California law, however, "pension rights" may be divided as community property even if they have not "vested." See *In re Brown,* 15 Cal. 3d 838, 544 P. 2d 561 (1976). A California trial court may divide the present value of such rights, which value must take into account the possibility that death or termination of employment may destroy them before they vest. *Id.,* at 848, 544 P. 2d, at 567. Alternatively, the court may maintain continuing jurisdiction, and award each spouse an appropriate portion of each pension payment as it is made. *Ibid.* The trial court here apparently elected the latter alternative.

ing the marriage. *Id.,* at 39, 44. Appellant was awarded custody of the couple's three minor children; appellee was awarded spousal support. The court found that the community property of the parties consisted of two automobiles, cash, the cash value of life insurance policies, and an uncollected debt. *Id.,* at 42. It allocated this property between the parties. *Id.,* at 45. In addition, the court held that appellant's "military pension and retirement rights" were subject to division as quasi-community property. *Ibid.* Accordingly, the court ordered appellant to pay to appellee, so long as she lives,

> "that portion of his total monthly pension or retirement payment which equals one-half (½) of the ratio of the total time between marriage and separation during which [appellant] was in the United States Army to the total number of years he has served with the . . . Army at the time of retirement." *Id.,* at 43–44.

The court retained jurisdiction "to make such determination at that time and to supervise distribution . . . ." *Ibid.* On September 30, 1978, appellant retired from the Army after 20 years of active duty and began receiving retired pay; under the decree of dissolution, appellee was entitled to approximately 45% of that retired pay.

Appellant sought review of the portion of the Superior Court's decree that awarded appellee an interest in the retired pay. The California Court of Appeal, First Appellate District, however, affirmed the award. App. to Juris. Statement 32. In so ruling, the court declined to accept appellant's contention that because the federal scheme of military retirement benefits pre-empts state community property laws, the Supremacy Clause, U. S. Const., Art. VI, cl. 2, precluded the trial court from awarding appellee a portion of his retired pay.[9] The court noted that this precise contention had

---

[9] The Court of Appeal also held that since appellant had invoked the jurisdiction of the California courts over both his marital and property

been rejected in *In re Fithian,* 10 Cal. 3d 592, 517 P. 2d 449, cert. denied, 419 U. S. 825 (1974).[10]  Furthermore, the court concluded that the result in *Fithian* had not been called into question by this Court's subsequent decision in *Hisquierdo* v. *Hisquierdo, supra,* where it was held that benefits payable under the federal Railroad Retirement Act of 1974 could not be divided under state community property law.  See also *Gorman* v. *Gorman,* 90 Cal. App. 3d 454, 153 Cal. Rptr. 479 (1979).[11]

The California Supreme Court denied appellant's petition for hearing.  App. to Juris. Statement 83.

We postponed jurisdiction.  449 U. S. 917 (1980).  We have now concluded that this case properly falls within our appellate jurisdiction,[12] and we therefore proceed to the merits.

---

rights, he was estopped from arguing that California community property law did not apply to him because he was an Oregon domiciliary.  App. to Juris. Statement 50–54.  Appellant has not renewed this argument before us.

[10] In *Fithian,* the Supreme Court of California concluded that there was "no evidence that the application of California community property law interferes in any way with the administration or goals of the federal military retirement pay system. . . ."  10 Cal. 3d, at 604, 517 P. 2d, at 457.

[11] In *Gorman,* the California Court of Appeal held that *Hisquierdo* was based on the unique history and language of the Railroad Retirement Act of 1974; the court therefore considered itself bound to follow *Fithian* "pending further consideration of the issue by the California Supreme Court."  90 Cal. App. 3d, at 462, 153 Cal. Rptr., at 483.  The California Supreme Court has since reaffirmed *Fithian* in *In re Milhan,* 27 Cal. 3d 765, 613 P. 2d 812 (1980), cert. pending *sub nom. Milhan* v. *Milhan,* No. 80–578.

[12] Appellee contends that this is not a proper appeal because appellant did not call the constitutionality of any statute into question in the California courts.  Our review of the record, however, leads us to conclude otherwise.  The Court of Appeal stated that appellant "also contends that the federal scheme of military retirement benefits pre-empts all state community property laws with respect thereto, and that California courts are accordingly precluded by the Supremacy Clause from dividing such benefits . . . ."  App. to Juris. Statement 57.  The court

## III

This Court repeatedly has recognized that " '[t]he whole subject of the domestic relations of husband and wife . . . belongs to the laws of the States and not to the laws of the United States.' " *Hisquierdo,* 439 U. S., at 581, quoting *In re Burrus,* 136 U. S. 586, 593–594 (1890). Thus, "[s]tate family and family-property law must do 'major damage' to 'clear and substantial' federal interests before the Supremacy Clause will demand that state law be overridden." *Hisquierdo,* 439 U. S., at 581, with references to *United States* v. *Yazell,* 382 U. S. 341, 352 (1966). See also *Alessi* v. *Raybestos-Manhattan, Inc.,* 451 U. S. 504, 522 (1981). In *Hisquierdo,* we concluded that California's application of community property principles to Railroad Retirement Act benefits worked such an injury to federal interests. The "critical terms" of the federal statute relied upon in reaching that conclusion included provisions establishing "a specified beneficiary protected by a flat prohibition against attachment and anticipation," see 45 U. S. C. § 231m, and a limited community property concept that terminated upon divorce, see 45 U. S. C. § 231d. 439 U. S., at 582–585. Appellee argues that no such provisions are to be found in the statute presently under consideration, and that therefore *Hisquierdo* is inapposite. But *Hisquierdo* did not hold that only the particular statutory terms there considered would justify a find-

---

flatly rejected this argument, *id.,* at 57–59, and appellant then renewed it in his petition for hearing, p. 1, before the California Supreme Court. The present case thus closely resembles *Dahnke-Walker Milling Co.* v. *Bondurant,* 257 U. S. 282 (1921), where a state statute was challenged as being in conflict with the Commerce Clause. The Court held that the appeal was proper, since the appellant "did not simply claim a right or immunity under the Constitution of the United States, but distinctly insisted that as to the transaction in question the . . . statute was void, and therefore unenforceable, because in conflict with the commerce clause . . . ." *Id.,* at 288–289. Accordingly, we conclude on the authority of *Dahnke-Walker* that this is a proper appeal. See also *Japan Line, Ltd.* v. *County of Los Angeles,* 441 U. S. 434, 440–441 (1979).

ing of pre-emption; rather, it held that "[t]he pertinent questions are whether the right as asserted conflicts with the express terms of federal law and whether its consequences sufficiently injure the objectives of the federal program to require nonrecognition." *Id.,* at 583. It is to that twofold inquiry that we now turn.

## A

Appellant argues that California's application of community property concepts to military retired pay conflicts with federal law in two distinct ways. He contends, first, that the California court's conclusion that retired pay is "awarded in return for services previously rendered," see *Fithian,* 10 Cal. 3d, at 604, 517 P. 2d, at 457, ignores clear federal law to the contrary. The community property division of military retired pay rests on the premise that that pay, like a typical pension, represents deferred compensation for services performed during the marriage. *Id.,* at 596, 517 P. 2d, at 451. But, appellant asserts, military retired pay in fact is current compensation for reduced, but currently rendered, services; accordingly, even under California law, that pay may not be treated as community property to the extent that it is earned after the dissolution of the marital community, since the earnings of a spouse while living "separate and apart" are separate property. Cal. Civ. Code Ann. §§ 5118, 5119 (West 1970 and Supp. 1981).

Appellant correctly notes that military retired pay differs in some significant respects from a typical pension or retirement plan. The retired officer remains a member of the Army, see *United States* v. *Tyler,* 105 U. S. 244 (1882),[13] and

---

[13] In *Tyler,* the Court held that a retired officer was entitled to the benefit of a statute that increased the pay of "commissioned officers." The Court reasoned:

"It is impossible to hold that men who are by statute declared to be part of the army, who may wear its uniform, whose names shall be borne upon its register, who may be assigned by their superior officers to specified

continues to be subject to the Uniform Code of Military Justice, see 10 U. S. C. § 802 (4). See also *Hooper* v. *United States,* 164 Ct. Cl. 151, 326 F. 2d 982, cert. denied, 377 U. S. 977 (1964). In addition, he may forfeit all or part of his retired pay if he engages in certain activities.[14] Finally, the retired officer remains subject to recall to active duty by the Secretary of the Army "at any time." Pub. L. 96–513, § 106, 94 Stat. 2868. These factors have led several courts, including this one, to conclude that military retired pay is reduced compensation for reduced current services. In *United States* v. *Tyler,* 105 U. S., at 245, the Court stated that retired pay is "compensation . . . continued at a reduced rate, and the connection is continued, with a retirement from active service only." [15]

---

duties by detail as other officers are, who are subject to the rules and articles of war, and may be tried, not by a jury, as other citizens are, but by a military court-martial, for any breach of those rules, and who may finally be dismissed on such trial from the service in disgrace, are still *not* in the military service." 105 U. S., at 246. (Emphasis in original.)

See also *Kahn* v. *Anderson,* 255 U. S. 1, 6–7 (1921); *Puglisi* v. *United States,* 215 Ct. Cl. 86, 97, 564 F. 2d 403, 410 (1977), cert. denied, 435 U. S. 968 (1978).

[14] A retired officer may lose part of his retired pay if he takes Federal Civil Service employment. See 5 U. S. C. § 5531 *et seq.* (1976 ed. and Supp. IV). He may lose all his pay if he gives up United States citizenship, see 58 Comp. Gen. 566, 568–569 (1979); accepts employment by a foreign government, U. S. Const., Art. I, § 9, cl. 8, but see Pub. L. 95–105, § 509, 91 Stat. 859 (granting congressional permission to engage in such employment with approval of the Secretary concerned and the Secretary of State); or sells supplies to an agency of the Department of Defense, or other designated agencies. 37 U. S. C. § 801. See also Pub. L. 87–849, § 2, 76 Stat. 1126 (retired officer may not represent any person in sale of anything to Government through department in whose service he holds retired status). The officer also may forfeit his retired pay if court-martialed. See *Hooper* v. *United States,* cited in the text.

[15] Relying upon *Tyler,* the Ninth Circuit recently rejected the argument that Congress' alteration of the method by which retired pay is calculated deprived retired military personnel of property without due

Having said all this, we need not decide today whether federal law prohibits a State from characterizing retired pay as deferred compensation, since we agree with appellant's alternative argument that the application of community property law conflicts with the federal military retirement scheme regardless of whether retired pay is defined as current or as deferred compensation.[16]  The statutory language is straight-

process of law. *Costello* v. *United States*, 587 F. 2d 424, 426 (1978), cert. denied, 442 U. S. 929 (1979). The court held that since "retirement pay does not differ from active duty pay in its character as pay for continuing military service," 587 F. 2d, at 427, its method of calculation could be prospectively altered under the precedent of *United States* v. *Larionoff*, 431 U. S. 864, 879 (1977). See also *Abbott* v. *United States*, 200 Ct. Cl. 384, cert. denied, 414 U. S. 1024 (1973); *Lemly* v. *United States*, 109 Ct. Cl. 760, 763, 75 F. Supp. 248, 249 (1948); *Watson* v. *Watson*, 424 F. Supp. 866. (EDNC 1976).

Some state courts also have concluded that military retired pay is not "property" within the meaning of their state divorce statutes because it does not have any "cash surrender value; loan value; redemption value; . . . [or] value realizable after death." *Ellis* v. *Ellis*, 191 Colo. 317, 319, 552 P. 2d 506, 507 (1976). See *Fenney* v. *Fenney*, 259 Ark. 858, 537 S. W. 2d 367 (1976).

[16] A number of state courts have held that military retired pay is deferred compensation, not current compensation for reduced services. See, *e. g.*, *In re Fithian*, 10 Cal. 3d, at 604, 517 P. 2d, at 456; *In re Miller*, — Mont. —, 609 P. 2d 1185 (1980), cert. pending *sub nom. Miller* v. *Miller*, No. 80–291; *Kruger* v. *Kruger*, 73 N. J. 464, 375 A. 2d 659 (1977). It is true that retired pay bears some of the features of deferred compensation. See W. Glasson, Federal Military Pensions in the United States 99 (1918). The amount of retired pay a service member receives is calculated not on the basis of the continuing duties he actually performs, but on the basis of years served on active duty and the rank obtained prior to retirement. See n. 7, *supra.* Furthermore, should the service member actually be recalled to duty, he receives additional compensation according to the active duty pay scale, and his rate of retired pay is also increased thereafter. 10 U. S. C. § 1402, as amended by Pub. L. 96–342, § 813 (b)(2), 94 Stat. 1102, and by Pub. L. 96–513, § 511 (50), 94 Stat. 2924.

Nonetheless, the fact remains that the retired officer faces not only significant restrictions upon his activities, but also a real risk of recall. At

forward: "A member of the Army retired under this chapter is entitled to retired pay . . . ." 10 U. S. C. § 3929. In *Hisquierdo,* 439 U. S., at 584, we emphasized that under the Railroad Retirement Act a spouse of a retired railroad worker was entitled to a separate annuity that terminated upon divorce, see 45 U. S. C. § 231d (c)(3); in contrast, the military retirement system confers no entitlement to retired pay upon the retired service member's spouse. Thus, unlike the Railroad Retirement Act, the military retirement system does not embody even a limited "community property concept." Indeed, Congress has explicitly stated: "Historically, military retired pay has been a *personal entitlement* payable to the retired member himself as long as he lives." S. Rep. No. 1480, 90th Cong., 2d Sess., 6 (1968) (emphasis added).

Appellee argues that Congress' use of the term "personal entitlement" in this context signifies only that retired pay ceases upon the death of the service member. But several features of the statutory schemes governing military pay demonstrate that Congress did not use the term in so limited a fashion. First, the service member may designate a beneficiary to receive any unpaid arrearages in retired pay upon his death. 10 U. S. C. § 2771.[17] The service member is free

---

the least, then, the possibility that Congress intended military retired pay to be in part current compensation for those risks and restrictions suggests that States must tread with caution in this area, lest they disrupt the federal scheme. See *Hooper* v. *United States,* 164 Ct. Cl., at 159, 326 F. 2d, at 987 ("the salary he received was not solely recompense for past services, but a means devised by Congress to assure his availability and preparedness in future contingencies"). Cf. Cong. Globe, 37th Cong., 1st Sess., 158 (1861) (remark of Sen. Grimes) (object of first nondisability retirement statute was "to retire gentlemen who have served the country faithfully and well for forty years, voluntarily if they see fit, (but subject, however, to be called into the service of the country at any moment that the President of the United States may ask for their services,) . . .").

[17] Section 2771 provides in relevant part:

"(a) In the settlement of the accounts of a deceased member of the armed forces . . . an amount due from the armed force of which he was a member

to designate someone other than his spouse or ex-spouse as the beneficiary; further, the statute expressly provides that "[a] payment under this section bars recovery by any other person of the amount paid." § 2771 (d). In *Wissner* v. *Wissner*, 338 U. S. 655 (1950), this Court considered an analogous statutory scheme. Under the National Service Life Insurance Act, an insured service member had the right to designate the beneficiary of his policy. *Id.*, at 658. *Wissner* held that California could not award a service member's widow half the proceeds of a life insurance policy, even though the source of the premiums—the member's Army pay—was characterized as community property under California law. The Court reserved the question whether California is "entitled to call army pay community property," *id.*, at 657, n. 2, since it found that Congress had "spoken with force and clarity in directing that the proceeds belong to the named beneficiary and no other." *Id.*, at 658. In the present context, Congress has stated with "force and clarity" that a beneficiary under § 2771 claims an interest in the re-

---

shall be paid to the person highest on the following list living on the date of death:

"(1) Beneficiary designated by him in writing to receive such an amount . . . .

"(2) Surviving spouse.

"(3) Children and their descendants, by representation.

"(4) Father and mother in equal parts or, if either is dead, the survivor.

"(5) Legal representative.

"(6) Person entitled under the law of the domicile of the deceased member."

Section 2771 was designed to "permit the soldier himself to designate a beneficiary for his final pay." H. R. Rep. No. 833, 84th Cong., 1st Sess., 2 (1955). While this statute gives a service member the power of testamentary disposition over any amount owed by the Government, we do not decide today whether California may treat active duty pay as community property. Cf. *Wissner* v. *Wissner*, 338 U. S. 655, 657, n. 2 (1950). We hold only that § 2771, in combination with other features of the military retirement system, indicates that Congress intended retired pay to be a "personal entitlement."

tired pay itself, not simply in proceeds from a policy purchased with that pay. One commentator has noted: "If retired pay were community property, the retiree could not thus summarily deprive his wife of her interest in the arrearage." Goldberg, Is Armed Services Retired Pay Really Community Property?, 48 Cal. Bar J. 12, 17 (1973).

Second, the language, structure, and legislative history of the RSFPP and the SBP also demonstrate that retired pay is a "personal entitlement." While retired pay ceases upon the death of the service member, the RSFPP and the SBP allow the service member to reduce his or her retired pay in order to provide an annuity for the surviving spouse or children. Under both plans, however, the service member is free to elect to provide no annuity at all, or to provide an annuity payable only to the surviving children, and not to the spouse. See 10 U. S. C. § 1434 (1976 ed. and Supp. IV) (RSFPP); § 1450 (1976 ed. and Supp. IV) (SBP). Here again, it is clear that if retired pay were community property, the service member could not so deprive the spouse of his or her interest in the property.[18] But we need not rely on this implicit conflict alone, for both the language of the statutes [19] and their legislative history make it clear that the

---

[18] An annuity under either plan is not "assignable or subject to execution, levy, attachment, garnishment, or other legal process." 10 U. S. C. § 1440 and § 1450 (i). Clearly, then, a spouse cannot claim an interest in an annuity not payable to him or her on the ground that it was purchased with community assets. See *Wissner,* 338 U. S., at 659. Cf. *Hisquierdo,* 439 U. S., at 584.

[19] The RSFPP provides in relevant part:

"To provide an annuity under section 1434 of this title, a [service member] may elect to receive a reduced amount of the retired pay or retainer pay *to which he may become entitled* as a result of service in his armed force." 10 U. S. C. § 1431 (b) (emphasis added).

The SBP states in relevant part:

"The Plan applies—

"(A) to a person who is eligible to participate in the Plan . . . and who is married or has a dependent child *when he becomes entitled to*

decision whether to leave an annuity is the service member's decision alone *because* retired pay is his or her personal entitlement. It has been stated in Congress that "[t]he rights in retirement pay accrue to the retiree and, ultimately, the decision is his as to whether or not to leave part of that retirement pay as an annuity to his survivors." H. R. Rep. No. 92–481, p. 9 (1971).[20] California's community property division of retired pay is simply inconsistent with this explicit expression of congressional intent that retired pay accrue to the retiree.

Moreover, such a division would have the anomalous effect of placing an ex-spouse in a better position than that of a widower or a widow under the RSFPP and the SBP.[21] Ap-

---

*retired or retainer pay,* unless he elects not to participate in the Plan before the first day for which he is eligible for that pay . . . ." 10 U. S. C. § 1448 (a) (2) (1976 ed., Supp. IV) (emphasis added).

[20] The SBP provides: "If a person who is married elects not to participate in the Plan at the maximum level or elects to provide an annuity for a dependent child but not for his spouse, that person's spouse shall be notified of the decision." 10 U. S. C. § 1448 (a). But, as both the language of this section and the legislative history make clear, the spouse only receives notice; the decision is the service member's alone. See H. R. Rep. No. 92–481, at 8–9. An election not to participate in the SBP is in most cases irrevocable if not revoked before the date on which the service member first becomes entitled to retired pay. § 1448 (a).

[21] In *Fithian,* 10 Cal. 3d, at 600, 517 P. 2d, at 454, the California Supreme Court observed and acknowledged: "Because federal military retirement pay carries with it no right of survivorship, the characterization of benefits as community property places the serviceman's ex-wife in a somewhat better position than that of his widow."

This is so for several reasons. If the service member does not elect to participate in the RSFPP or SBP, his widow will receive nothing. In contrast, if an ex-spouse has received an offsetting award of presently available community property to compensate her for her interest in the expected value of the retired pay, see n. 8, *supra,* she continues to be provided for even if the service member dies prematurely. See *Hisquierdo,* 439 U. S., at 588–589. Furthermore, whereas an SBP annuity payable to a surviving spouse terminates if he or she remarries prior to age 60,

pellee argues that "Congress' concern for the welfare of soldiers' widows sheds little light on Congress' attitude toward the community treatment of retirement benefits," quoting *Fithian,* 10 Cal. 3d, at 600, 517 P. 2d, at 454. But this argument fails to recognize that Congress deliberately has chosen to favor the widower or widow over the ex-spouse. An ex-spouse is not an eligible beneficiary of an annuity under either plan. 10 U. S. C. § 1434 (a) (RSFPP); §§ 1447 (3) and 1450 (a) (SBP). In addition, under the RSFPP, deductions from retired pay for a spouse's annuity automatically cease upon divorce, § 1434 (c), so as "[t]o safeguard the participants' future retired pay when . . . divorce occurs . . . ." S. Rep. No. 1480, 90th Cong., 2d Sess., 13 (1968). While the SBP does not expressly provide that annuity deductions cease upon divorce, the legislative history indicates that Congress' policy remained unchanged. The SBP, which was referred to as the "widow's equity bill," 118 Cong. Rec. 29811 (1972) (statement of Sen. Beall), was enacted because of Congress' concern over the number of widows left without support through low participation in the RSFPP, not out of concern for ex-spouses. See H. R. Rep. No. 92–481, pp. 4–5 (1971); S. Rep. No. 92–1089, p. 11 (1972).

Third, and finally, it is clear that Congress intended that military retired pay "actually reach the beneficiary." See *Hisquierdo,* 439 U. S., at 584. Retired pay cannot be attached to satisfy a property settlement incident to the dissolution of a marriage.[22] In enacting the SBP, Congress re-

---

see 10 U. S. C. § 1450 (b), the ex-spouse's community awards against the retired service member continue despite remarriage. Lastly, annuity payments are subject to Social Security offsets, see 10 U. S. C. § 1451, whereas community property awards are not. It is inconceivable that Congress intended these anomalous results. See Goldberg, Is Armed Services Retired Pay Really Community Property?, 48 Cal. Bar J. 89 (1973).

[22] In addition, an Army enlisted man may not assign his pay. 37 U. S. C. § 701 (c). While an Army officer may transfer or assign his pay account "[u]nder regulations prescribed by the Secretary of the

jected a provision in the House bill, H. R. 10670, that would have allowed attachment of up to 50% of military retired pay to comply with a court order in favor of a spouse, former spouse, or child. See H. R. Rep. No. 92–481, at 1; S. Rep. No. 92–1089, at 25. The House Report accompanying H. R. 10670 noted that under *Buchanan* v. *Alexander,* 4 How. 20 (1845), and *Applegate* v. *Applegate,* 39 F. Supp. 887 (ED Va. 1941), military pay could not be attached so long as it was in the Government's hands; [23] thus, this clause of H. R. 10670 represented a "drastic departure" from current law, but one that the House Committee on Armed Services believed to be necessitated by the difficulty of enforcing support orders. H. R. Rep. No. 92–481, at 17–18. Although this provision passed the House, it was not included in the Senate version of the bill. See S. Rep. No. 92–1089, at 25. Thereafter, the House acceded to the Senate's view that the attachment provision would unfairly "single out military retirees for a form of enforcement of court orders imposed on no other employees or retired employees of the Federal Government." 118 Cong. Rec. 30151 (1972) (remarks of Rep. Pike); S. Rep. No. 92–

Army," he may do so only when the account is "due and payable." § 701 (a). This limitation would appear to serve the same purpose as the prohibition against "anticipation" discussed in *Hisquierdo,* 439 U. S., at 588–589. Cf. *Smith* v. *Commanding Officer, Air Force Accounting and Finance Center,* 555 F. 2d 234, 235 (CA9 1977). But even if there were no explicit prohibition against "anticipation" here, it is clear that the injunction against attachment is not to be circumvented by the simple expedient of an offsetting award. See *Hisquierdo,* 439 U. S., at 588. Cf. *Free* v. *Bland,* 369 U. S. 663, 669 (1962).

[23] Appellee contends, mistakenly in our view, that the doctrine of non-attachability set forth in *Buchanan* simply "restate[s] the Government's sovereign immunity from burdensome garnishment suits . . . ." See *Hisquierdo,* 439 U. S., at 586. Rather than resting on the grounds that garnishment would be administratively burdensome, *Buchanan* pointed out: "The funds of the government are specifically appropriated to certain national objects, and if such appropriations may be diverted and defeated by state process or otherwise, the functions of the government may be suspended." 4 How., at 20. See also H. R. Rep. No. 92–481, at 17.

1089, at 25. Instead, Congress determined that the problem of the attachment of military retired pay should be considered in the context of "legislation that might require all Federal pays to be subject to attachment." *Ibid.;* 118 Cong. Rec. 30151 (1972) (remarks of Rep. Pike).

Subsequently, comprehensive legislation was enacted. In 1975, Congress amended the Social Security Act to provide that all federal benefits, including those payable to members of the Armed Services, may be subject to legal process to enforce child support or alimony obligations. Pub. L. 93–647, § 101 (a), 88 Stat. 2357, 42 U. S. C. § 659. In 1977, however, Congress added a new definitional section (§ 462 (c)) providing that the term "alimony" in § 659 (a) "does not include any payment or transfer of property . . . in compliance with any community property settlement, equitable distribution of property, or other division of property between spouses or former spouses." Pub. L. 95–30, § 501 (d), 91 Stat. 159, 42 U. S. C. § 662 (c) (1976 ed., Supp. IV). As we noted in *Hisquierdo,* it is "logical to conclude that Congress, in adopting § 462 (c), thought that a family's need for support could justify garnishment, even though it deflected other federal benefits from their intended goals, but that community property claims, which are not based on need, could not do so." 439 U. S., at 587.

*Hisquierdo* also pointed out that Congress might conclude that this distinction between support and community property claims is "undesirable." *Id.,* at 590. Indeed, Congress recently enacted legislation that requires that Civil Service retirement benefits be paid to an ex-spouse to the extent provided for in "the terms of any court order or court-approved property settlement agreement incident to any court decree of divorce, annulment, or legal separation." Pub. L. 95–366, § 1 (a), 92 Stat. 600, 5 U. S. C. § 8345 (j)(1) (1976 ed., Supp. IV). In an even more extreme recent step, Congress amended the Foreign Service retirement legislation to provide that, as a matter of federal law, an ex-spouse is en-

titled to a pro rata share of Foreign Service retirement benefits.[24] Thus, the Civil Service amendments require the United States to recognize the community property division of Civil Service retirement benefits by a state court, while the Foreign Service amendments establish a limited federal community property concept. Significantly, however, while similar legislation affecting military retired pay was introduced in the 96th Congress, none of those bills was reported out of committee.[25] Thus, in striking contrast to its amend-

---

[24] Under § 814 of the Foreign Service Act of 1980, Pub. L. 96–465, 94 Stat. 2113, a former spouse who was married to a Foreign Service member for at least 10 years of creditable service is entitled to a pro rata share of up to 50% of the member's retirement benefits, unless otherwise provided by spousal agreement or court order; the former spouse also may claim a pro rata share of the survivor's annuity provided for the member's widow. Moreover, the member cannot elect not to provide a survivor's annuity without the consent of his spouse or former spouse.

The Committee Reports commented upon the radical nature of this legislation. See H. R. Rep. No. 96–992, pt. 1, pp. 70–71 (1980); S. Rep. No. 96–913, pp. 66–68 (1980); H. R. Conf. Rep. No. 96–1432, p. 116 (1980). During the floor debates Representative Schroeder pointed out: "Whereas social security provides automatic benefits for spouses and former spouses, married at least 10 years, Federal retirement law has previously not recognized the contribution of the nonworking spouse or former spouse." 126 Cong. Rec. 28659 (1980). Representative Schroeder also noted that Congress had "thus far" failed to enact legislation that would extend to the military the "equitable treatment of spouses" afforded under the Civil Service and Foreign Service retirement systems. Id., at 28660.

[25] Like the Foreign Service amendments, H. R. 2817, 96th Cong., 1st Sess. (1979), would have entitled a former spouse to a pro rata share of the retired pay and of the annuity provided to the surviving spouse; similarly, the bill would have required the service member to obtain the consent of his spouse and ex-spouse before electing not to provide a survivor's annuity. This bill was referred to the House Committee on Armed Services along with two other bills, H. R. 3677, 96th Cong., 1st Sess. (1979), and H. R. 6270, 96th Cong., 2d Sess. (1980). Whereas H. R. 2817 would have amended Title 10 to bring it into conformity with the Foreign Service model, these other two bills paralleled the Civil Service legislation, and would have authorized the United States to comply with the terms of a court decree or property settlement in connection with

ment of the Foreign Service and Civil Service retirement systems, Congress has neither authorized nor required the community property division of military retired pay. On the contrary, that pay continues to be the personal entitlement of the retiree.

## B

We conclude, therefore, that there is a conflict between the terms of the federal retirement statutes and the community property right asserted by appellee here. But "[a] mere conflict in words is not sufficient"; the question remains whether the "consequences [of that community property right] sufficiently injure the objectives of the federal program to require nonrecognition." *Hisquierdo,* 439 U. S., at 581–583. This inquiry, however, need be only a brief one, for it is manifest that the application of community property principles to military retired pay threatens grave harm to "clear and substantial" federal interests. See *United States* v. *Yazell,* 382 U. S., at 352. Under the Constitution, Congress has the power "[t]o raise and support Armies," "[t]o provide and maintain a Navy," and "[t]o makes Rules for the Government and Regulation of the land and naval Forces." U. S. Const., Art. I, § 8, cls. 12, 13, and 14. See generally *Rostker* v. *Goldberg, ante,* at 59. Pursuant to this grant of authority, Congress has enacted a military retirement system designed to accomplish two major goals: to provide for the retired service member, and to meet the personnel manage-

the divorce of a service member receiving retired pay. After extensive hearings, all three bills died in committee. See Hearing on H. R. 2817, H. R. 3677, and H. R. 6270 before the Military Compensation Subcommittee of the House Committee on Armed Services, 96th Cong., 2d Sess. (1980).

Legislation has been introduced in the 97th Congress that would require the pro rata division of military retired pay. See H. R. 3039, 97th Cong., 1st Sess. (1981), and S. 888, 97th Cong., 1st Sess. (1981). See also H. R. 3040, 97th Cong., 1st Sess. (1981) (pro rata division of retirement benefits of any federal employee).

ment needs of the active military forces. The community property division of retired pay has the potential to frustrate each of these objectives.

In the first place, the community property interest appellee seeks "promises to diminish that portion of the benefit Congress has said should go to the retired [service member] alone." See *Hisquierdo*, 439 U. S., at 590. State courts are not free to reduce the amounts that Congress has determined are necessary for the retired member. Furthermore, the community property division of retired pay may disrupt the carefully balanced scheme Congress has devised to encourage a service member to set aside a portion of his or her retired pay as an annuity for a surviving spouse or dependent children. By diminishing the amount available to the retiree, a community property division makes it less likely that the retired service member will choose to reduce his or her retired pay still further by purchasing an annuity for the surviving spouse, if any, or children. In *McCune* v. *Essig*, 199 U. S. 382 (1905), the Court held that federal law, which permitted a widow to patent federal land entered by her husband, prevailed over the interest in the patent asserted by the daughter under state inheritance law; the Court noted that the daughter's contention "reverses the order of the statute and gives the children an interest paramount to that of the widow through the laws of the State." *Id.*, at 389. So here, the right appellee asserts "reverses the order of the statute" by giving the ex-spouse an interest paramount to that of the surviving spouse and children of the service member; indeed, at least one court (in a noncommunity property State) has gone so far as to hold that the heirs of the ex-spouse may even inherit her interest in military retired pay. See *In re Miller*, —— Mont. ——, 609 P. 2d 1185 (1980), cert. pending *sub nom. Miller* v. *Miller*, No. 80–291. Clearly, "[t]he law of the State is not competent to do this." *McCune* v. *Essig*, 199 U. S., at 389.

The potential for disruption of military personnel management is equally clear. As has been noted above, the military retirement system is designed to serve as an inducement for enlistment and re-enlistment, to create an orderly career path, and to ensure "youthful and vigorous" military forces.[26] While conceding that there is a substantial interest in attracting and retaining personnel for the military forces, appellee argues that this interest will not be impaired by allowing a State to apply its community property laws to retired military personnel in the same manner that it applies those laws to civilians. Yet this argument ignores two essential characteristics of military service: the military forces are national in operation; and their members, unlike civilian employees, cf. *Hisquierdo,* are not free to choose their place of residence. Appellant, for instance, served tours of duty in four States and the District of Columbia. The value of retired pay as an inducement for enlistment or re-enlistment is obviously diminished to the extent that the service member recognizes that he or she may be involuntarily transferred to a State that will divide that pay upon divorce. In *Free* v. *Bland,*

---

[26] A recent Presidential Commission has questioned the extent to which the military retirement system actually accomplishes these goals. See Report of the President's Commission on Military Compensation 49–56 (1978). Moreover, the Department of Defense has taken the position that service members are legally bound to comply with financial settlements ordered by state divorce courts; but while the Department did not oppose the legislation introduced in the 96th Congress that would have required the United States to honor community property divisions of military retired pay by state courts, it did express its concern over the dissimilar treatment afforded service members depending on whether or not they are stationed in community property States. See Hearing on H. R. 2817, H. R. 3677, and H. R. 6270 before the Military Compensation Subcommittee of the House Committee on Armed Services, 96th Cong., 2d Sess., 55, 58, 63 (1980) (statement of Deputy Assistant Secretary Tice). Of course, the questions whether the retirement system should be amended so as better to accomplish its personnel management goals, and whether those goals should be subordinated to the protection of the service member's ex-spouse, are policy issues for Congress to decide.

369 U. S. 663 (1962), the Court held that state community property law could not override the survivorship provision of a federal savings bond, since it was "[o]ne of the inducements selected," *id.*, at 669, to make purchase of such bonds attractive; similarly, retired pay is one of the inducements selected to make military service attractive, and the application of state community property law thus "interfere[s] directly with a legitimate exercise of the power of the Federal Government." *Ibid.*

The interference with the goals of encouraging orderly promotion and a youthful military is no less direct. Here, as in the Railroad Retirement Act context, "Congress has fixed an amount thought appropriate to support an employee's old age and to encourage the employee to retire." See *Hisquierdo,* 439 U. S., at 585. But the reduction of retired pay by a community property award not only discourages retirement by reducing the retired pay available to the service member, but gives him a positive incentive to keep working, since current income after divorce is not divisible as community property. See Cal. Civ. Code Ann. §§ 5118, 5119 (West 1970 and Supp. 1981). Congress has determined that a youthful military is essential to the national defense; it is not for States to interfere with that goal by lessening the incentive to retire created by the military retirement system.

## IV

We recognize that the plight of an ex-spouse of a retired service member is often a serious one. See Hearing on H. R. 2817, H. R. 3677, and H. R. 6270 before the Military Compensation Subcommittee of the House Committee on Armed Services, 96th Cong., 2d Sess. (1980). That plight may be mitigated to some extent by the ex-spouse's right to claim Social Security benefits, cf. *Hisquierdo,* 439 U. S., at 590, and to garnish military retired pay for the purposes of support. Nonetheless, Congress may well decide, as it has in the Civil Service and Foreign Service contexts, that more protection

should be afforded a former spouse of a retired service member. This decision, however, is for Congress alone. We very recently have re-emphasized that in no area has the Court accorded Congress greater deference than in the conduct and control of military affairs. See *Rostker* v. *Goldberg, ante,* at 64–65. Thus, the conclusion that we reached in *Hisquierdo* follows *a fortiori* here: Congress has weighed the matter, and "[i]t is not the province of state courts to strike a balance different from the one Congress has struck." 439 U. S., at 590.

The judgment of the California Court of Appeal is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE REHNQUIST, with whom JUSTICE BRENNAN and JUSTICE STEWART join, dissenting.

The Court's opinion is curious in at least two salient respects. For all its purported reliance on *Hisquierdo* v. *Hisquierdo,* 439 U. S. 572 (1979), the Court fails either to quote or cite the test for pre-emption which *Hisquierdo* established. In that case the Court began its analysis, after noting that States "lay on the guiding hand" in marriage law questions, by stating:

"On the rare occasion where state family law has come into conflict with the federal statute, this Court has limited review under the Supremacy Clause to a determination whether Congress has 'positively required by direct enactment' that state law be pre-empted. *Wetmore* v. *Markoe,* 196 U. S. 68, 77 (1904)." *Id.,* at 581.

The reason for the omission of this seemingly critical sentence from the Court's opinion today is of course quite clear: the Court cannot, even to its satisfaction, plausibly maintain that Congress has "positively required by direct enactment" that California's community property law be pre-empted by the

provisions governing military retired pay. The most that the Court can advance are vague implications from tangentially related enactments or Congress' *failure* to act. The test announced in *Hisquierdo* established that this was not enough and so the critical language from that case must be swept under the rug.

The other curious aspect of the Court's opinion, related to the first, is the diverting analysis it provides of laws and legislative history having little if anything to do with the case at bar. The opinion, for example, analyzes at great length Congress' actions concerning the attachability of federal pay to enforce alimony and child support awards, *ante,* at 228–230. However interesting this subject might be, this case concerns community property rights, which are quite distinct from rights to alimony or child support, and there has in fact been no effort by appellee to attach appellant's retired pay. To take another example, we learn all about the provisions governing Foreign Service and Civil Service retirement pay, *ante,* at 230–232. Whatever may be said of these provisions, it cannot be said that they are "direct enactments" on the question whether *military* retired pay may be treated as community property. The conclusion is inescapable that the Court has no solid support for the conclusion it reaches—certainly no support of the sort required by *Hisquierdo*—and accordingly I dissent.

I

Both family law and property law have been recognized as matters of peculiarly local concern and therefore governed by state and not federal law. *In re Burrus,* 136 U. S. 586, 593–594 (1890); *United States* v. *Yazell,* 382 U. S. 341, 349, 353 (1966). Questions concerning the appropriate disposition of property upon the dissolution of marriage, therefore, such as the question in this case, are particularly within the control of the States, and the authority of the States should not be displaced except pursuant to the clearest direction from Con-

gress. Only in five previous cases has this Court found pre-emption of community property law. An examination of those cases clearly establishes that there is no precedent supporting admission of this case to the exclusive club.

The first such case was *McCune* v. *Essig*, 199 U. S. 382 (1905). McCune's father, a homesteader, died before completing the necessary conditions to obtain title to the land. McCune claimed that under the community property laws of the State of Washington she was entitled to a half interest in her father's land. Congress in the Homestead Act, however, had "positively required by direct enactment," *Hisquierdo, supra,* at 581, that in the case of a homesteader's death the *widow* would succeed to the homesteader's interest in the land. Indeed, the Act set forth an explicit schedule of succession which specifically provided for a homesteader's daughter such as McCune. She succeeded to rights and fee under the statute only in the case of the death of both her father and mother. In the words of Justice McKenna:

> "It requires an exercise of ingenuity to establish uncertainty in these provisions. . . . The words of the statute are clear, and express who in turn shall be its beneficiaries. The contention of appellant reverses the order of the statute and gives the children an interest paramount to that of the widow through the laws of the state." 199 U. S., at 389.

There is, of course, nothing remotely approaching this situation in the case at bar. Congress has not enacted a schedule governing rights of ex-spouses to military retired pay and appellee's claim does not go against any such schedule.[1]

---

[1] The Court maintains that the present case is like *McCune*: "[s]o here, the right appellee asserts 'reverses the order of the statute' by giving the ex-spouse an interest paramount to that of the surviving spouse and children of the service member . . . ." *Ante,* at 233. With all respect, I do not understand the statute to establish *any* ordered list of those with interests in *retired pay*. The Court's argument is apparently that rec-

The next case from this Court finding pre-emption of community property law did not arise until 45 years later. In *Wissner* v. *Wissner,* 338 U. S. 655 (1950), the deceased serviceman's estranged wife claimed she was entitled to one-half of the proceeds of a National Service Life Insurance policy, the premiums of which were paid out of the serviceman's pay accrued while he was married, even though decedent had designated his parents as the beneficiaries. The Act in question specifically provided that the serviceman shall have " 'the right to designate the beneficiary or beneficiaries of the insurance [within a designated class], . . . and shall . . . at all times have the right to change the beneficiary or beneficiaries.' " *Id.,* at 658 (quoting 38 U. S. C. § 802 (g) (1946 ed.)). As the Court interpreted this, "Congress has spoken with force and clarity in directing that the proceeds belonged to the named beneficiary and no other." 338 U. S., at 658. That is not at all the case here. Congress has provided that the serviceman receive retired pay in 10 U. S. C. § 3929, to be sure, but that is simply the general provision permitting payment—it hardly evinces the "deliberate purpose of Congress" concerning the question before us, as was the case with the designation of a life insurance policy beneficiary in *Wissner.* 338 U. S., at 659.

The Court in *Wissner* also noted that the statute provided that "[p]ayments to the named beneficiary 'shall be exempt

---

ognizing the ex-spouse's interest in retired pay would burden the serviceman's decision to fund an annuity for his current spouse out of retired pay. This is of course a far cry from the situation in *McCune,* where the statute accorded the surviving widow and daughter specific places and the daughter sought to switch the order by invoking community property law. Even if the Court is correct that there is a conflict between California's community property law and the decision of the serviceman to fund an annuity out of retired pay, the answer is not to pre-empt community property treatment across the board, but only to the extent of the conflict, *i. e.,* permit community property treatment of retired pay less any amounts which are used to fund an annuity. See *infra,* at 245.

from the claims of creditors, and shall not be liable to attachment, levy, or seizure by or under any legal or equitable process whatever, either before or after receipt by the beneficiary.'" *Ibid.* (quoting 38 U. S. C. § 816 (1946 ed.)). The wife's claim was thus in "flat conflict" with the terms of the statute. 338 U. S., at 659. This forceful and unambiguous language protecting the rights of the designated beneficiary has no parallel so far as military retired pay is concerned.

It is important to recognize that the Court's analysis, while purporting to rely on *Wissner,* actually is contrary to the analysis in that case. As will be explored in greater detail below, the Court focuses on two provisions in concluding that military retired pay cannot be treated as community property: the provision permitting a serviceman to designate who shall receive any arrearages in pay after his death, and the provision permitting a retired serviceman to fund an annuity for someone other than the ex-spouse out of retired pay. The Court's theory is that since the serviceman can dispose of part of the retired pay without participation of the ex-spouse—either the arrearages or the premiums to fund the annuity—the retired pay cannot be treated as community property. This, however, is *precisely* the analysis the *Wissner* court *declined* to adopt in concluding that the proceeds of an insurance policy, purchased with military pay, could not be treated as community property. The *Wissner* court simply concluded that the wife could not pursue her community property claim *to the proceeds,* even though purchased with community property funds. This is comparable to ruling in this case that appellee cannot obtain half of any annuity funded out of retired pay pursuant to the statute, or half of the arrearages, when the serviceman has designated someone else to receive them. The *Wissner* court specifically left open the question whether the whole from which the premiums were taken—the military pay—could be treated as community property. *Id.,* at 657, n. 2. That is, however, the analytic jump the Court takes today, in ruling that retired pay cannot

be treated as community property simply because parts of it, or proceeds of parts of it—arrearages and the annuity—cannot be.[2]

The next two cases, *Free* v. *Bland,* 369 U. S. 663 (1962), and *Yiatchos* v. *Yiatchos,* 376 U. S. 306 (1964), involved the same provisions. Plaintiffs sought community property rights in United States Savings Bonds, even though duly issued Treasury Regulations provided that designated co-owners would, upon the death of the other co-owner, be "the sole and absolute owner" of the bonds. No such language is involved in this case.

The most recent case is, of course, *Hisquierdo,* in which the Court held that Congress in the Railroad Retirement Act pre-empted community property laws so that a railroad worker's pension could not be treated as community property. It bears noting that this case is not *Hisquierdo* revisited. In *Hisquierdo* there was a specific statutory provision which satisfied the requirement that Congress " 'positively requir[e] by direct enactment' that state law be pre-empted." 439 U. S., at 581 (quoting *Wetmore* v. *Markoe,* 196 U. S. 68, 77 (1904)). Section 14 of the Railroad Retirement Act of 1974, carrying forward the provisions of § 12 of the Act of 1937, provided:

> "Notwithstanding any other law of the United States, or of any State, territory, or the District of Columbia, no annuity or supplemental annuity shall be assignable or be subject to any tax or to garnishment, attachment, or other legal process under any circumstances whatsoever, nor shall the payment thereof be anticipated." 45 U. S. C. § 231m.

---

[2] The error in the Court's logic is perhaps most apparent when it is recognized that the arrearages provision applies to *regular* military pay as well as retired pay. The Court's logic would compel the conclusion that regular pay is thus not subject to community property treatment, an untenable position which the Court itself shies away from without explanation, *ante,* at 224–225, n. 17.

The *Hisquierdo* Court viewed this provision as playing "a most important role in the statutory scheme," 439 U. S., at 583–584. The Court stressed the language "[n]otwithstanding any other law . . . of any State," *id.*, at 584, and noted that § 14 "pre-empts all state law that stands in its way." *Ibid.*

With all the emphasis placed on § 14 in *Hisquierdo,* one would have expected the counterpart in the military retired pay scheme to figure prominently in the Court's opinion today. There is, however, nothing approaching § 14 in the military retired pay scheme. The closest analogue, 37 U. S. C. § 701 (a), is buried in footnote 22 of the Court's opinion. It simply provides:

> "Under regulations prescribed by the Secretary of the Army or the Secretary of the Air Force, as the case may be, a commissioned officer of the Army or the Air Force may transfer or assign his pay account, when due and payable."

The contrast with the provision in *Hisquierdo* is stark. Section 14 *forbids* assignment; § 701 (a) *permits* it. Section 14 contains a "flat prohibition against attachment and anticipation," 439 U. S., at 582; all that can be gleaned from § 701 (a) is a negative implication prohibiting *voluntary* assignments prior to the time pay is due and payable. Such a limit is of course a far cry from the *Hisquierdo* provision requiring that the retired pay may not be subject to "legal process under any circumstances whatsoever" and that it shall not "be anticipated." It is no wonder § 701 (a) is buried in a footnote in the Court's opinion.[3]

---

[3] The Court states that "[r]etired pay cannot be attached to satisfy a property settlement incident to the dissolution of a marriage," *ante,* at 228. The sources for this are not statutory but rather a common-law doctrine, *Buchanan* v. *Alexander,* 4 How. 20 (1845), and a House Report explaining a decision not to enact a bill, see *ante,* at 228–230. The Court cannot of course justify either source as Congress "positively requir[ing] by direct

In addition to § 14 the *Hisquierdo* Court also relied on the fact that the Railroad Retirement Act provided a separate spousal entitlement, "embod[ying] a community concept to an extent." 439 U. S., at 584. Under the Railroad Retirement Act, 45 U. S. C. § 231d (c), a spouse is entitled to a separate benefit, which terminates upon divorce. § 231d (c)(3). Congress explicitly considered extending the spousal benefit to a divorced spouse but declined to do so. 439 U. S., at 585. The *Hisquierdo* Court found support in this not to permit California to expand the community property concept beyond its limited use by Congress in the Act. No similar separate spousal entitlement, terminable on divorce, exists in the statutes governing military retired pay. The "this far and no further" implication in *Hisquierdo,* therefore, cannot be made here.

## II

The foregoing demonstrates that today's decision is not simply a logical extension of prior precedent. That does not, to be sure, mean that it is necessarily wrong—there has to be a first time for everything. But examination of the analysis in the Court's opinion convinces me that it is both unprecedented and wrong.

In its analysis the Court contrasts the statute involved in *Hisquierdo,* noting that there spouses received an annuity which terminated upon divorce. Here there is no such provision. As the Court states its conclusion: "Thus, unlike the Railroad Retirement Act, the military retirement system does not embody even a limited 'community property concept.' " *Ante,* at 224. This analysis, however, is the exact opposite

---

enactment" that state law be pre-empted. See *Hisquierdo,* 439 U. S., at 581. Thus even accepting the rule, it does not, as § 14 of the Railroad Retirement Act did in *Hisquierdo,* evince the strong *congressional intent* that military retired pay "actually reach the beneficiary." And congressional intent is all the prohibition on attachment is relevant to, since appellee seeks neither anticipation of pay nor attachment from the Government.

of the analysis employed in *Hisquierdo*. As we have seen, there the Court's point was that Congress had provided *some* community property rights and made a conscious decision to provide *no more:*

> "Congress carefully targeted the benefits created by the Railroad Retirement Act. It even embodied a community concept to an extent. . . . Congress purposefully abandoned that theory, however, in allocating benefits upon absolute divorce. . . . The choice was deliberate." 439 U. S., at 584–585.

Now we are told that pre-emption of community property law is suggested in this case because there is *no* community property concept *at all* in the statutory scheme. Under *Hisquierdo*, this absence would have been thought to suggest that there was no pre-emption, since the argument could not be made, as it was in *Hisquierdo*, that Congress had addressed the question and drawn the line. See *In re Milhan*, 27 Cal. 3d 765, 775–776, 613 P. 2d 812, 817 (1980), cert. pending *sub nom. Milhan* v. *Milhan*, No. 80–578. I am not certain whether the analysis was wrong in *Hisquierdo* or in this case, but it is clear that both cannot be correct. One is led to inquire where this moving target will next appear.

The Court also relies on "several features of the statutory scheme" as evidence that Congress intended military retired pay to be the "personal entitlement" of the serviceman. The Court first focuses on 10 U. S. C. § 2771, which permits a serviceman to select the beneficiary of unpaid arrearages. As we have seen, *supra*, at 240–241, the Court's reliance on *Wissner* in this context establishes, at most, only that *unpaid arrearages* cannot be treated as community property, not that retired pay in general cannot be. A provision permitting a serviceman to tell the Government where to mail his last paycheck after his death hardly supports the inference of a congressional intent to pre-empt state law governing disposition of military retired pay in general.

The Court next relies on the statutory provisions permitting a retired serviceman to fund an annuity for his potential widow and/or dependent children out of retired pay. Even granting the Court its premise that the annuity is not subject to community property treatment, the conclusion that military retired pay is not subject to community property treatment simply does not follow. If California's community property law conflicts with permitting a retired serviceman to fund an annuity out of retired pay, then by all means override California's law—*to the extent of the conflict.* Even if Congress did intentionally intrude on community property law to the extent of permitting a serviceman to fund an annuity, that hardly supports an intent to intrude on all community property law. Nothing in the Court's analysis shows any reason why appellee should not be entitled to one-half of appellant's retired pay *less amounts he uses to fund an annuity,* should he decide to do so.

The Court resists the recognition of any rights to retired pay in the ex-spouse because of a policy judgment that it would be "anomalous" to place the ex-spouse in a better position than a widow receiving benefits under an annuity. *Ante,* at 227. The Court, however, is comparing apples and oranges in two respects. The ex-spouse's rights are to retired pay, and *cease* when the serviceman dies. The widow's rights are to an annuity which *begins* when the serviceman dies. The fact that Congress "deliberately has chosen to favor the widower or widow over the ex-spouse" so far as the annuity is concerned, *ante,* at 228, simply has no relevance to the rights of the ex-spouse to the retired pay itself. Second, the ex-spouse has contributed to the earning of the retired pay to the same degree as the serviceman, according to state law. The widow may have done nothing at all to "earn" her annuity, as would be the case, for example, if appellant remarried and funded an annuity for his widow out of retired pay. In view of this, I see nothing "anomalous" in providing the ex-spouse with rights in retired pay. In any event, such pol-

icy questions are for Congress to decide, not the Court, and the Court fails in its efforts to show *Congress* has found California's system anomalous.

The third argument advanced by the Court is the weakest of all: the Court argues that an ex-spouse in a community property State cannot obtain half of the military retired pay, by attachment or otherwise, because she *can* obtain alimony and child support by attachment. This is pre-emption by negative implication—not the "positive requirement" and "direct enactment" which *Hisquierdo* indicated were required. And since appellee does not seek to attach anything, even the negative implication is not directly relevant.

The Court also stresses the recognition of community property rights in varying degrees in the Foreign Service and Civil Service laws. Again, this hardly meets the *Hisquierdo* test. Both the Foreign Service and Civil Service laws are quite different from the military retired pay laws. The former contain strong anti-attachment provisions like § 14 of the Railroad Retirement Act considered in *Hisquierdo,* see 5 U. S. C. § 8346; 22 U. S. C. § 1104, so Congress could well have thought explicit legislation was necessary in these areas.

## III

The very most that the Court establishes, therefore, is that the provisions governing arrearages and annuities pre-empt California's community property law. There is no support for the leap from this narrow pre-emption to the conclusion that the community property laws are pre-empted so far as military retired pay in general is concerned. Such a jump is wholly inconsistent with this Court's previous pronouncements concerning a State's power to determine laws concerning marriage and property in the absence of Congress' "direct enactment" to the contrary, and I therefore dissent.