[No. D002015. Fourth Dist., Div. One. Feb. 27, 1986.]

In re the Marriage of DARLENE CLARA and LARRY CARL STIER.
DARLENE CLARA STIER, Appellant, v.
LARRY CARL STIER, Appellant.

**COUNSEL**

Ellman & Stein and Melvyn B. Stein for Appellant Wife.

Knoll, Corr & Pfeifer and John C. Knoll for Appellant Husband.

**OPINION**

**KREMER, P. J.**—Nine years after her divorce, Darlene Clara Stier brought an action against her former husband, Larry Carl Stier, to reduce

underpayment of her interest in his military retired pay to judgment. The trial court determined Darlene did have a one-half community property interest in Larry's retired pay, but applied the federal Uniformed Services Former Spouses' Protection Act (FUSFSPA) to limit Darlene's interest in a part of the retirement benefits. Both Darlene and Larry appeal, respectively arguing the rule of *In re Marriage of Stenquist* (*Stenquist I*) (1978) 21 Cal.3d 779 [148 Cal.Rptr. 9, 582 P.2d 96], and the mandate of FUSFSPA should apply to all of Larry's military retired pay. We find applying either authority retroactively affects long-settled property rights and, for the reasons discussed herein, is unwarranted. We affirm in part and reverse in part.

FACTUAL AND PROCEDURAL BACKGROUND

On June 15, 1973, the dissolution of Larry and Darlene's marriage was tried. The next day, the United States Marine Corps, in accord with 10 United States Code[1] section 1202, transferred Larry from active duty to a 40 percent temporary disability retirement. At that time, he had already completed over 20 years of active military service.

The interlocutory dissolution judgment was filed on July 9, 1973, and provided, inter alia, "petitioner LARRY CARL STIER shall pay to respondent the sum of $211.65 per month which represents one-half of the petitioner's *retirement benefits* received from the United States Marine Corps which is deemed to be community property. Should these retirement benefits increase or decrease in the future there is to be an adjustment accordingly." (Italics added.) The final judgment incorporating this passage by reference was entered on October 4, 1973, and was never appealed. After the judgment, Larry began paying Darlene, but consistently underpaid the community property share due. Arrears accrued. In July 1975, after a periodic physical evaluation, Larry was found to be suffering a congenital heart defect and bilateral hearing loss and was placed on 80 percent permanent disability retirement.

Shortly after the United States Supreme Court's 1981 decision in *McCarty* v. *McCarty* (1981) 453 U.S. 210 [69 L.Ed.2d 589, 101 S.Ct. 2728], Larry stopped paying his retirement benefits to Darlene entirely. On June 11, 1982, Darlene filed an order to show cause to reduce Larry's arrears to judgment. After a hearing, the trial court decided in Darlene's favor and ordered Larry to pay arrears of $15,180.68 and to continue paying one-half of his gross military retired pay. However, on February 3, 1983, two days

---

[1]All statutory references are to title 10 of the United States Code unless otherwise specified.

after the enactment of FUSFSPA,[2] Larry moved for and was granted reconsideration. The court modified its previous decision and awarded Darlene arrears computed on a 50 percent share of Larry's retirement benefits before June 26, 1981, the day after FUSFSPA's operative date. In computing the amount owed to Darlene after June 26, 1981, the court determined FUSFSPA preempted state court jurisdiction over all but "disposable retired and retainer pay."[3] Having thus ruled, the court then determined that since Larry received 80 percent permanent disability retirement pay, Darlene was entitled to one-half of the remaining disposable retired pay, that is, one-half of the remaining 20 percent of Larry's retirement pay less the statutorily prescribed deductions of section 1408(a)(4).[4] Both Larry and Darlene appeal from the trial court's order.

## DISCUSSION

### I

On appeal, both parties challenge the trial court's calculation of arrears: Darlene claims a one-half community property interest in Larry's disability retirement benefits under the rule of *Stenquist I, supra,* 21 Cal.3d 779, and Larry asserts after FUSFSPA the trial court lacked subject matter jurisdiction to award Darlene *any* of his disability retired pay.[5]

---

[2]Public Law No. 97-252, 96 Statutes at Large 730 (Feb. 1, 1983) enacted in part as 10 United States Code section 1408.

[3]Section 1408(a)(4) states: " 'Disposable retired or retainer pay' means the total monthly retired or retainer pay to which a member is entitled (other than the retired pay of a member retired for disability under chapter 61 of this title) less amounts which— [¶] (A) are owed by that member to the United States; [¶] (B) are required by law to be and are deducted from the retired or retainer pay of such member, including fines and forfeitures ordered by courts-martial, Federal employment taxes, and amounts waived in order to receive compensation under title 5 or title 38; [¶] (C) are properly withheld for Federal, State, or local income tax purposes, if the withholding of such amounts is authorized or required by law and to the extent such amounts withheld are not greater than would be authorized if such member claimed all dependents to which he was entitled; [¶] (D) are withheld under section 3402(i) of the Internal Revenue Code of 1954 (26 U.S.C. 3402(i)) if such member presents evidence of a tax obligation which supports such withholding; [¶] (E) are deducted as Government life insurance premiums (not including amounts deducted for supplemental coverage); or [¶] (F) are deducted because of an election under chapter 73 of this title to provide an annuity to a spouse or former spouse to whom payment of a portion of such member's retired or retainer pay is being made pursuant to a court order under this section."

[4]Under any application of case or statutory law, this computation is erroneous. Larry's 80 percent disability rating only determined the *amount* of retirement benefits he would receive. The *entire amount* was denominated disability retired pay.

[5]In his notice of appeal Larry also contended the *McCarty* decision should be retroactively applied to eliminate Darlene's interest in his military retired pay. However, in his brief Larry rightly concedes our courts have not applied *McCarty* retroactively to final state court decisions and submits no further argument on this point. (*In re Marriage of Thomas* (1984)

Larry begins by averring the July 9, 1973, dissolution judgment did not distinguish between disability and longevity retired pay and is now subject to collateral attack on that issue. Larry is mistaken. ■ Under the well-settled principles of res judicata, a final judgment by a court of competent jurisdiction is presumptively valid and immune from collateral attack. (Code Civ. Proc., §§ 1908, 1909, 1910, 1911; *Armstrong* v. *Armstrong* (1976) 15 Cal.3d 942, 950-951 [126 Cal.Rptr. 805, 544 P.2d 941]; *In re Marriage of Thomas, supra,* 156 Cal.App.3d at p. 638.) In analyzing a challenge to res judicata, "three questions are pertinent: Was the issue decided in the prior adjudication identical with the one presented in the action in question? Was there a final judgment on the merits? Was the party against whom the plea is asserted a party or in privity with the party to the prior adjudication?" (*Bernhard* v. *Bank of America* (1942) 19 Cal.2d 807, 813 [122 P.2d 892]; accord *Dakins* v. *Board of Pension Commissioners* (1982) 134 Cal.App.3d 374, 382 [184 Cal.Rptr. 576].)

Here, Larry challenges only the identity of the issues. However, in the final judgment, for which Larry himself petitioned, the trial court unequivocally awarded Darlene one-half of Larry's "retirement benefits received from the United States Marine Corps . . . ." Clearly, the courts at that time regarded retirement benefits arising from employment as community property subject to equal division.[6] (*Waite* v. *Waite* (1972) 6 Cal.3d 461 [99 Cal.Rptr. 325, 492 P.2d 13]; *Phillipson* v. *Board of Administration* (1970) 3 Cal.3d 32 [89 Cal.Rptr. 61, 473 P.2d 765]; *French* v. *French* (1941) 17 Cal.2d 775 [112 P.2d 235, 134 A.L.R. 366].) Whatever challenge Larry could have brought regarding the division of his disability retired pay he should have brought at that time. A collateral attack now is neither warranted nor justified. (See *Smith* v. *Smith* (1981) 127 Cal.App.3d 203, 207-209 [179 Cal.Rptr. 492].) Moreover, Larry may not have originally viewed the distinction between his disability and longevity pay as significant since, as he presently concedes, at the time he retired the amount he would have received under either retirement program was identical. In sum, the division of community property effected in the underlying final judgment must stand.

In 1978 the California Supreme Court more thoroughly addressed the disability-longevity retirement distinction in *Stenquist I, supra,* 21 Cal.3d

---

156 Cal.App.3d 631, 637-638 [203 Cal.Rptr. 58]; *In re Marriage of Camp* (1983) 142 Cal.App.3d 217, 219-221 [191 Cal.Rptr. 45]; *In re Marriage of Parks* (1982) 138 Cal.App.3d 346, 348-349 [188 Cal.Rptr. 26]; *In re Marriage of McGhee* (1982) 131 Cal.App.3d 408, 411 [182 Cal.Rptr. 456]; *In re Marriage of Fellers* (1981) 125 Cal.App.3d 254, 256-258 [178 Cal.Rptr. 35]; see *In re Marriage of Sheldon* (1981) 124 Cal.App.3d 371, 376-380 [177 Cal.Rptr. 380].)

[6]Affirming a lower court's decision, the California Supreme Court, on January 3, 1974, specifically ruled military retirement benefits were community property. (*In re Marriage of Fithian* (1974) 10 Cal.3d 592 [111 Cal.Rptr. 369, 517 P.2d 449].)

779. In that case, the husband retired on disability pay, apparently under chapter 61 of title 10 of the United States Code, after serving 26 years in the military. Given his disability rating, the husband qualified for disability pay at 75 percent of his basic service pay. His longevity retired pay at that time would have been 65 percent of his basic pay. "Assuming the husband desired the higher amount, the Army began making 'disability' payments to him." (*Id.* at p. 783.) Husband argued disability pay was his separate property. In analyzing the case, the Supreme Court first found the purported transmutation effected by husband electing disability retired pay was unjust. "[S]uch a result would violate the settled principle that one spouse cannot, by invoking a condition wholly within his control, defeat the community interest of the other spouse." (*Id.* at p. 786.) Looking beneath the "disability" label, the Supreme Court next found a military disability pension did more than compensate the pensioner for lost wages resulting from a compelled and premature retirement. "Because [disability retired pay] replaces a 'retirement' pension, and is computed in part on the basis of longevity of service and rank at retirement, it also serves the objective of providing support for the serviceman and his spouse after he leaves the service. Moreover, as the veteran approaches normal retirement age, this latter purpose may become the predominate function served by the 'disability' pension." (*Id.* at p. 787.) Thus, the court concluded "military retired pay based on disability contains two components: (a) compensation to the serviceman for loss of earning power and personal suffering, and (b) retirement support. The latter component, to the extent that it is attributable to employment during marriage, is community property." (*Id.* at p. 791, fn. omitted.)

Darlene asserts *Stenquist I* reaffirms her community property interest in Larry's retired pay, whether denominated as either "longevity" or "disability," and establishes the formula by which arrears should be computed. However, the dissolution judgment in this case was final some five years *before Stenquist I.* Thus, the application of *Stenquist I* which Darlene seeks is, in effect, retroactive and, as such, is specifically prohibited[7] by the Supreme Court in the *Stenquist I* opinion.[8]

■ Resolving the parties' respective challenges to this point, we find Darlene has a community property interest in one-half of Larry's gross

---

[7]Footnote 14, at page 791 states: "Following the policy of *In re Marriage of Brown* [(1976)] 15 Cal.3d 838, 851 [126 Cal.Rptr. 633, 544 P.2d 561, 94 A.L.R.3d 164], our holding respecting the division of military 'disability' pensions applies retroactively only to cases, 'in which the property rights arising from the marriage have not yet been adjudicated, to such rights if such adjudication is still subject to appellate review, or if in such adjudication the trial court has expressly reserved jurisdiction to divide pension rights.'"

[8]Resolving this issue as we have, we need not address Larry's contention *Stenquist I* does not apply to the present facts because he was "involuntarily" placed on disability retirement and hence never elected disability pay.

retirement benefits at the time of judgment and subsequent increases or adjustments directly related thereto. Such increases did not contemplate and consequently do not include the increased benefits Larry received for the *postdissolution* aggravation of his disability. Thus, the formula to calculate Larry's community property arrearage must be stated in two parts. The first covers the period between October 4, 1973, the day of final judgment, and July 31, 1975, the day before Larry was placed on 80 percent permanent disability. During that time, Darlene was entitled to one-half times Larry's gross military retirement pay, meaning all retired pay received regardless of nomenclature, less amounts already paid Darlene during that period. The amount owing since Larry's permanent disability retirement is calculated as one-half times Larry's gross military retirement pay during this period less additional benefits attributable solely to Larry's transfer to permanent disability, less amounts already paid Darlene during this same time.

## II

In his final challenge to the above calculations, Larry relies upon FUSFSPA to assert California courts no longer have subject matter jurisdiction over military disability retired pay. Before directly addressing Larry's contention, it is necessary to review FUSFSPA's background. FUSFSPA was speedily enacted in the wake of the Supreme Court's decision in *McCarty*. In that case, the Supreme Court examined the conflict between the federal statutory scheme for military retirement and state community property laws. Finding no congressional statement *expressly* preempting state community property laws (see *McCarty* v. *McCarty, supra,* 453 U.S. at pp. 236-237 [69 L.Ed.2d at pp. 608-609] [dis. opn. of Rehnquist, J.]), the court instead examined circumstantial evidence of conflict and found sufficiently "grave harm to 'clear and substantial' federal interests" to hold state community property laws were *impliedly* preempted under the supremacy clause. (*Id.* at p. 232 [69 L.Ed.2d at pp. 604-605].) In concluding, the court acknowledged the plight of the former military spouses, but stated the protections afforded to these persons were within Congress' purview alone. Congress responded some 14 months later by enacting FUSFSPA which was intended to supplant the effects of the *McCarty* decision and "to restore the law to what it was when the courts were permitted to apply State divorce laws to military retired pay." (Sen.Rep. No. 97-502, 2d Sess., p. 5 (1982); 1982 U.S. Code Cong. & Admin. News, p. 1599.)

Larry points to section 1408(c)(1) and (a)(4) to argue FUSFSPA does, nevertheless, bar state courts from disposing military disability pay. Section 1408(c)(1) provides: "Subject to the limitations of this section, a court may treat disposable retired or retainer pay payable to a member for pay periods beginning after June 25, 1981, either as property solely of the

member or as property of the member and his spouse in accordance with the law of the jurisdiction of such court." Subsection (a)(4) defines disposable retired or retainer pay as "the total monthly retired or retainer pay to which a member is entitled (other than the retired pay of a member retired for disability under chapter 61 of this title)" less several statutorily specified deductions. Both Larry's temporary and permanent disabilities were authorized under chapter 61 of title 10. Reading these sections together and construing "treat" quite broadly, he concludes our state courts can no longer consider disability retired pay in calculating underpayment of a community property obligation previously decreed in a long final judgment. However, Larry's construction of these sections is erroneous, and we propound four reasons for this conclusion.

First, Congress' exclusion of title 10, chapter 61 disability pay from disposable retired pay cannot be seen as expressly preempting state court treatment of it.[9] We have precisely addressed this issue before and restate our analysis at length: "[I]n defining 'disposable retired or retainer pay,' Congress specifically excluded 'the retired pay of a member retired for disability under chapter 61 of this title.' (10 U.S.C. § 1408(a)(4).) Thus, it is argued, Congress has not accorded the states power to apply state community property laws to military disability pay . . . . It is further argued, any attempt by the California Legislature or judicial authorities to exercise power over the husband's disability pay and to whom it may be given is void as an unconstitutional infringement upon the powers of Congress protected by the supremacy clause of the United States Constitution, article VI, clause 2. ▪ Under the supremacy clause, the rights and expectancies established by federal law are protected against the operation of state law which might otherwise frustrate and erode federal congressional policy. (See *Ridgway* v. *Ridgway* (1981) 454 U.S. 46, 53-55 [70 L.Ed.2d 39, 46-48, 102 S.Ct. 49, 54-55].)

"This argument relies upon the Act's failure to address whether disability retirement pay may or may not be treated by state courts as property of the member and his or her spouse. This omission is read to prohibit the State of California from treating disability retirement pay as community property. Nothing in the Act nor in case law warrants a conclusion that Congress merely by failing to include disability pay in the definition of 'disposable retired or retainer pay' intended to deprive the state courts of jurisdiction to determine the individual or community character of disability retirement pay in family law proceedings. ▪ The correct standard for review under

---

[9]Nor can we find any basis for implied preemption. Whatever factual predicates supported the preemption analysis in *McCarty,* such facts can no longer be seen as creating conflict with federal statutory schemes after FUSFSPA. Further, Larry fails to present any new factual basis to support a finding of implied preemption.

the supremacy clause was stated by the United States Supreme Court recently in *Hisquierdo* v. *Hisquierdo* (1979) 439 U.S. 572, at page 581 [59 L.Ed.2d 1, at page 11, 99 S.Ct. 802]: 'On the rare occasion when state family law has come into conflict with a federal statute, this Court has limited review under the Supremacy Clause to a determination whether Congress has "positively required by direct enactment" that state law be preempted. [Citation.]' *Hisquierdo* also said: '[S]tate interests "should be overridden by the federal courts only where clear and substantial interests of the National Government, which *cannot* be served consistently with respect for such state interests, will suffer major damage if the state law is applied."' (*Id.*, at p. 595 [59 L.Ed.2d at p. 19].)" (*In re Marriage of Cullen* (1983) 145 Cal.App.3d 424, 428-429 [193 Cal.Rptr. 590]; accord *In re Marriage of Mastropaolo* (1985) 166 Cal.App.3d 953, 961-963 [213 Cal.Rptr. 26]; *In re Marriage of Stenquist* (*Stenquist II*) (1983) 145 Cal.App.3d 430, 434 [193 Cal.Rptr. 587]; but see *In re Marriage of Costo* (1984) 156 Cal.App.3d 781, 787, fn. 11 [203 Cal.Rptr. 85].)

Second, even assuming, as Larry argues, "FUSFSPA prohibits division of disability retired pay," there is no indication Congress intended FUSFSPA to be applied retroactively to community property divisions otherwise final long before its effective date, February 1, 1983.[10] In reviewing its version of FUSFSPA, section 1814, the Senate stated: "The primary purpose of the bill is to remove the effect of the United States Supreme Court decision in *McCarty* v. *McCarty*, 453 U.S. 210 (1981). The bill would accomplish this objective by permitting Federal, State, and certain other courts, consistent with the appropriate laws, to once again consider military retired pay *when fixing the property rights between the parties to a divorce, dissolution, annulment or legal separation.*" (Sen. Rep. No. 97-502, *supra*, p. 1; 1982 U.S. Code Cong. & Admin. News, p. 1596, italics added.)

Similarly, a conference committee reporting on House amendments to FUSFSPA stated: "The House amendment would permit disposable military retired pay to be considered as property in divorce settlements under certain specified conditions. This provision in the House amendment would have *the effect of reversing the decision* of the United States supreme court [*sic*] in the case of *McCarty* v. *McCarty*, 453 U.S. 210 (1981), which held that a court could not order a *division* of non-disability retired pay as part of a distribution *of community property incident to a divorce proceeding.*" (H.R.

---

[10]Historically in dissolution proceedings, our courts have characterized *gross* military retired pay and divided it accordingly. (*In re Marriage of Fithian, supra,* 10 Cal.3d at p. 604.) Whether FUSFSPA limits the initial characterizing and dividing of military pensions to disposable (or *net*) retired or retainer pay is a question currently pending in the Supreme Court. (*In re Marriage of Harmon* (L.A. 32130, rev. granted Nov. 27, 1985); *Casas* v. *Thompson* (L.A. 32131, rev. granted Nov. 27, 1985).)

Rep. No. 749, 97th Cong., 2d Sess. (1982); 1982 U.S. Code Cong. & Admin. News, p. 1570, italics added.)

This history reveals a clear congressional intent to reinvigorate state marital property laws and to reestablish an uninterrupted continuum in the development of these laws such that pre- and post-*McCarty* property divisions are decided on the same principles. (See generally Newton & Trail, *Uninformed [sic] Services Former Spouses' Protection Act—A Legislative Answer to the McCarty Problem* (1983) 46 Tex. Bar J. 291; Horkovich, *Uniformed Services Former Spouses' Protection Act: Congress' Answer to McCarty v. McCarty Goes Beyond the Fundamental Question* (1982) 23 A.F.L. Rev. 287; see also *In re Marriage of Chambers* (1985) 174 Cal.App.3d 1079, 1082-1083 [220 Cal.Rptr. 504] [discussing the effect of *McCarty* and FUSFSPA on California community property law].) To effect this end, Congress specifically limited FUSFSPA's retroactivity to June 25, 1981, the day before the *McCarty* decision. (§ 1408(c)(1).) Moreover, the express limitations FUSFSPA brings to the enforcement of final state court orders affects the *manner of direct payment* to the former spouse, not the validity of his or her previously adjudicated property rights.[11] Indeed, section 1006(b) of the enacting legislation (Pub.L. No. 97-252) specifically recognizes, under FUSFSPA's direct-pay provisions, the enforceability of all final court orders "without regard to the date of any court order." (See *In re Marriage of Hopkins* (1983) 142 Cal.App.3d 350, 356, fn. 11, 360 [191 Cal.Rptr. 70].)

Our Courts of Appeal have affirmed FUSFSPA's limited retroactive application to property divisions in not-yet-final cases. (*In re Marriage of Ankenman* (1983) 142 Cal.App.3d 833, 837-838 [191 Cal.Rptr. 292]; *In re Marriage of Hopkins, supra,* 142 Cal.App.3d at pp. 356-360; *In re Marriage of Frederick* (1983) 141 Cal.App.3d 876, 879-880 [190 Cal.Rptr. 588]; see also *Mueller* v. *Walker* (1985) 167 Cal.App.3d 600 [213 Cal.Rptr. 442] [denying FUSFSPA's retroactive application to a judgment which became final after the *McCarty* decision, but before FUSFSPA's effective date].) However, even in this limited application, FUSFSPA's retroactivity has been questioned. In *Ankenman,* the court examined FUSFSPA's limited

---

[11]On this point, Senate Report No. 97-502 states: "[The Senate version of FUSFSPA] imposes three distinct limits on the division or enforcement of court orders against military retired pay in divorce cases. First, the total amount of the disposable retired or retainer pay of a member which the Service Secretary could pay out to satisfy a court order for prospective obligations could not exceed 50 percent of such pay. Second, this bill would not create in the spouse or former spouse any right, title or interest which could be sold, assigned, transferred or disposed of by will or inheritance. Third, the courts could not direct that a service member retire at a particular time in order to effectuate any payment out of retired pay to a spouse or former spouse." (Sen. Rep. No. 97-502, *supra,* p. 4; 1982 U.S. Code Cong. & Admin. News, p. 1599.)

retroactivity under the due process analysis of *In re Marriage of Bouquet* (1976) 16 Cal.3d 583 [128 Cal.Rptr. 427, 546 P.2d 1371]. The court concluded such application did not contravene the due process clause, and specifically emphasized the judgment in the underlying case was *not final* when FUSFSPA was enacted. (*In re Marriage of Ankenman, supra,* 142 Cal.App.3d at p. 838.)

Only one court has applied FUSFSPA retroactively to modify, in effect, a final judgment. In *In re Marriage of Costo, supra,* 156 Cal.App.3d 781, a case on which Larry relies, a final judgment awarded the wife 46 percent of the husband's gross military retired pay. Thereafter, the husband qualified for disability retirement under title 38 of the United States Code. Such disability benefits are earmarked for deduction from gross retired pay to determine disposable retired pay. (§ 1408(a)(4)(B).) After *McCarty,* husband ceased paying retirement benefits to wife, and a hearing was held to determine arrears. The trial court followed the original decree and determined the wife was entitled to 46 percent of the husband's gross retirement pay, including that portion designated as disability retired pay. Finding "Congress clearly intended to and did exclude [title 38 disability pay] from *division* by the state courts . . .", the Court of Appeal reversed. (*Id.* at p. 786, italics added.) While the appellate court's expression of congressional intent may be correct,[12] it does not dispose of the issue presented in both that case and the instant one. In both, the *division* of community property was long settled and final. The subsequent actions to determine arrears were grounded in the respective and previously adjudicated property rights of the parties. The trial court in the instant case was not, as *Costo* suggests,[13] effecting a new characterization or division of community property. That the court in *Costo* was looking toward the initial division of community property and not some subsequent enforcement action is further revealed in its suggestion that: "If any inequity arises in an individual case as a result of this decision, the trial court can resolve this matter by making an appropriate award of spousal support." (*Id.* at p. 788, fn. 12.) Such a suggestion could resolve inequity *only if* the trial court awarded spousal support in its

---

[12]See footnote 10, *ante.*

[13]The *Costo* court unfailingly related FUSFSPA's mandate to the state court's ability to *divide* military retired pay: "It is clear that Congress granted to the states the limited right to *divide* 'disposable retired pay'" (*id.* at p. 786); "Congress did not give California the unlimited right to treat military retirement pay in accordance with its general community property laws. It merely provided for the *division* of disposable pay rather than gross retired pay" (*id.* at pp. 786-787); "It is a matter for the legislative branch to determine whether military disability payment is to be *divided* by the states" (*id.* at p. 787); "Disability pay is to be excluded from *division* by the state courts" (*id.* at p. 788, fn. omitted); and "[A] state court may not treat the portion of appellant's military retirement waived in order to receive veterans benefits as community property subject to *division*" (*id.* at p. 788, all italics added). The only time the court referred to the calculation of arrears was in its disposition and directions to the trial court.

*original* dissolution judgment or, at least, reserved jurisdiction to do so. (Civ. Code, § 4801, subds. (a), (d); *Bain* v. *Superior Court* (1974) 36 Cal.App.3d 804, 808-810 [111 Cal.Rptr. 848].) Moreover, the court in *Costo* looked no further than the plain language of FUSFSPA to reach its result. We find the legislative history and espoused purpose of FUSFSPA compel a different conclusion. Thus, Larry's attempt to apply FUSFSPA retroactively to a final judgment finds no support in the reasoning of *Costo*.

Third, the strong policy considerations underlying the finality of a judgment are traversed by applying FUSFSPA retroactively to the instant case. (See *In re Marriage of Fellers, supra,* 125 Cal.App.3d at pp. 256-257.) Under Larry's construction, any military pensioner receiving disability retired pay, or able to qualify for disability under the code sections specified in section 1408(a)(4), could immediately stop paying his community property obligations adjudged at dissolution, and await his or her former spouse's attempt to enforce the prior judgment. At such a hearing, the trial court would lack jurisdiction over disability retired pay and the former spouse would be precluded from enforcing that aspect of his or her formerly won property rights because the military retiree unilaterally transmuted retired pay into disability retired pay. Certainly, Congress, acting to protect former military spouses as FUSFSPA's very name indicates, could not have intended such a result. As this court has previously stated: "In perhaps no other area of law is the need for stability and finality greater than [in] marriage and family law. . . . To permit and in fact encourage the relitigation of property interests long after the issues were supposedly settled would merely serve to reopen old wounds and create new ones." (*In re Marriage of Sheldon, supra,* 124 Cal.App.3d at pp. 379-380.) And, if FUSFSPA disregards sound public policy and modifies final judgments as easily as Larry suggests, our Legislature would have had no need to enact Civil Code section 5124. (See *Mueller* v. *Walker, supra,* 167 Cal.App.3d at pp. 605-607.) This special sunset legislation allowed "[c]ommunity property settlements, judgments, or decrees that became *final* on or after June 25, 1981, and before February 1, 1983, may be modified to include a division of military retirement benefits payable on or after February 1, 1983, in a manner consistent with federal law and the law of this state as it existed before June 26, 1981, and as it has existed since February 1, 1983." (Italics added.)

Finally, we reject Larry's construction of FUSFSPA to avoid a conflict with the Constitution. ▇ It is fundamental "'[s]tatutes are to be so construed, if their language permits, as to render them valid and constitutional rather than invalid and unconstitutional' [citation] and that California courts must adopt an interpretation of a statutory provision which, 'consistent with the statutory language and purpose, eliminates doubt as to the

provision's constitutionality' [Citation]." (*People* v. *Amor* (1974) 12 Cal.3d 20, 30 [114 Cal.Rptr. 765, 523 P.2d 1173].) Here, the final dissolution judgment vests Darlene's community property interest in Larry's military retired pay. Indeed, the judgment itself is a property interest which Darlene holds. (*Curtin* v. *Kowalsky* (1904) 145 Cal. 431, 434 [78 P. 962].) Larry's desired construction of FUSFSPA strips the superior courts of jurisdiction to enforce Darlene's vested rights. ■ Our courts have long recognized "[d]estroying enforcement of a vested right is . . . tantamount to destroying the right itself." (*Baldwin* v. *City of San Diego* (1961) 195 Cal.App.2d 236, 240 [15 Cal.Rptr. 576]; accord *In re Marriage of Buol* (1985) 39 Cal.3d 751, 758 [218 Cal.Rptr. 31, 705 P.2d 354].) Absent due process, the destruction of vested rights in such a manner is proscribed by the Constitution. (*Baldwin* v. *City of San Diego, supra,* at p. 240; see *Krusesky* v. *Baugh* (1982) 138 Cal.App.3d 562, 566 [188 Cal.Rptr. 57].) However, this constitutional pitfall is easily avoided in the present case by denying full retroactive application to FUSFSPA.

■ In sum, we find the limitations of section 1408(a)(4) and (c)(1), whatever they may be, have no bearing on determining arrears for community property obligations decreed in judgments long final before February 1, 1983, the effective date of FUSFSPA. Thus, the formulae set out in section I control the calculation of arrears in the present case. Further, Darlene requests attorney's fees under Civil Code section 4370 and we grant this request.

## DISPOSITION

That part of the order granting Darlene a community property interest in Larry's military retired pay is affirmed; the remainder of the order is reversed. The trial court is directed to conduct further proceedings consistent with this opinion and to compute Larry's arrears according to the formulae set out in section I. Further, the trial court shall determine and award attorney's fees under Civil Code section 4370.

Mitchell, J.,* concurred.

Lewis, J., concurred in the result.

On March 24, 1986, the opinion was modified to read as printed above. The petition of appellant Husband for review by the Supreme Court was denied June 4, 1986.

---

*Assigned by the Chairperson of the Judicial Council.